COMPTROLLER OF THE TREASURY *v.* EQUITABLE
TRUST COMPANY

[No. 147, September Term, 1982.]

*Decided August 11, 1983.*

460

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*John K. Barry, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Paul E. Burke, Jr.,* with whom were *McKenney, Thomsen & Burke* on the brief, for appellee.

*Amicus curiae* brief of Data Processing Management Association filed. *William W. Cahill, Jr., Robert W. Baker, Jr., Desmond D. Connall, Jr.* and *Weinberg & Green* on the brief.

RODOWSKY, J., delivered the opinion of the Court.

This is a sales tax case. It involves computer programs in the business data processing field. At issue is how the computer program license transactions presented here are to be conceptualized under the statute which reaches sales of "any tangible personal property." Md. Code (1957, 1980 Repl. Vol.), Art. 81, § 324 (f). Did the taxpayer, a computer user, acquire from the proprietors of canned, transactional computer programs

> 1. intangible personal property, namely, the right to use the programs, with copies of the programs transferred by the medium of magnetic tapes; or

2. intangible personal property, namely, "knowledge" or "information," which was transferred to the taxpayer by the temporary medium of magnetic tape; or

3. tangible personal property, namely, magnetic tapes which had been enhanced in value by the copies of the programs coded thereon?

Alternatives 1 and 2 result in no tax. An *amicus,* Data Processing Management Association, has raised the first alternative. The taxpayer, Equitable Trust Company (Equitable), emphasizes the second analysis. The Comptroller urges the third position, which we adopt.

As of September 16, 1974, Equitable entered into a written contract, delineated "License Agreement," with Auxton Computer Enterprises, Incorporated (AUXCO). AUXCO granted Equitable a nontransferable and nonexclusive right to use a program, the "AUXCO Project Management System," at a one-time price of $20,000. There was no termination date. Equitable covenanted not to publish or disclose to any third person any information concerning the program and not to copy the program tapes or documentation except for internal use. Paragraph 10 of the agreement in part provided that "[l]egal title to the System shall remain with AUXCO, and [Equitable] agrees that AUXCO may repossess the System" upon breach by Equitable of its obligations. This program was acquired for use by Equitable's systems and programming people in tracking project performance.

By a "License Agreement" of December 13, 1974 with PACE Applied Technology, Inc. (PACE), Equitable acquired the right to use two PACE programs in perpetuity. One was the "KOMAND Data Acquisition System" for the price of $10,800. The other was the "KOMAND Resource Billing System" for a price of $4,365. The agreement placed restrictions on Equitable's disclosing PACE's proprietary information. The PACE programs were described in testimony as an accounting system which would allow Equitable to know exactly how much its computer and peripheral equipment

were used for running specific applications, such as the main deposit program or the time deposit program.

⋅ During an audit in 1975, the Comptroller assessed sales tax against Equitable based upon the prices paid pursuant to the foregoing agreements. That assessment was affirmed by a hearing officer in the Sales Tax Division whose decision was affirmed by the Maryland Tax Court. On appeal to the Baltimore City Court (now the Circuit Court for Baltimore City), the assessment was abated. That court concluded as a matter of law that the dominant purpose or essence of the transactions was the programs and that computer programs are intangible. The Comptroller appealed to the Court of Special Appeals.[1] We issued the writ of certiorari on our own motion prior to consideration of the matter by the intermediate appellate court.

## (1)

Before the legal contentions can be considered, some fundamentals should be stated. A computer is a machine. It does not think. It is designed to execute predetermined instructions. Ultimately a "program" is a set of such instructions. An "applicational program," as we shall use the term, is a set of instructions that will cause the machine to perform a specific task. An example from the banking field would be a program which listed certain information with respect to each installment loan account for which any payment was delinquent. Unless otherwise specified, "program" as used in this opinion will mean an applicational program.[2]

---

**1.** Equitable also filed a "protective cross-appeal" from the circuit court judgment which was wholly in Equitable's favor. Equitable's point is that it had moved in the circuit court for a remand to the Maryland Tax Court for the purpose of supplementing the factual record. The circuit court had no need to rule on the motion for remand, because it found in Equitable's favor. Thus, Equitable's "cross-appeal" really invites an appellate court to remand in the event the record is insufficient to decide the appeal. We have concluded that no remand is necessary. As reflected by Equitable's very detailed proffer in its motion to remand, much of what Equitable sought to prove on remand merely clarifies what is implicit in the record as made.

**2.** Applicational programs are sometimes distinguished from operational

Development of a program requires knowledge, time and effort. A program may be said to exist in different levels of language and in different physical forms. Theoretically, a program could exist in the mind of the programmer, but, as a practical matter, programs as obviously complex as those involved here must be recorded somewhere in some physical representation. In human readable form on paper, this representation might be in a procedure oriented language, e.g., COBOL or FORTRAN, in a symbolic language, or in machine language. "Machine language ... is a series of numbers, letters of the alphabet, or special characters that are used to represent bit [(binary digit)] patterns which can be recognized by the computer and cause specific operations to take place." W. Fuori, *Introduction to the Computer,* at 270 (2d ed. 1977). Symbolic language is "very closely related to machine language in that, in general, one symbolic instruction will translate into one-machine language

---

programs. A description of operational programs, considered as a whole, may be found in J. Vles, *Computer Fundamentals for Nonspecialists,* at 33 (1981).

Every computer has a "background" program running at all times. This background program, called by many names but usually referred to as "monitor," "operating system," or "executive system," does exactly what its name says it should do: it monitors and directs everything that is going on in the computer. It allocates space for data on disk (and it remembers where it put it), it tells the memory to get data from the disk, and it decides where there is room in memory for these data; it mingles in everything from getting the user "signed on" to getting him "signed off" the computer; it is the universal "policeman" of the system. Everything that goes on inside the computer, at any time, is guided by the monitor. Needless to say, the monitor is usually the largest and most complicated program that is running; it is certainly the most important, for without it even the most sophisticated computer is only a bunch of wires, transistors, and metal that is totally inadequate to solve any problems.

Operational software

includes compilers, which translate input symbolic codes into machine [instructions] and can replace certain items of input with series of instructions called subroutines; sorts, which place items of data in order; and utility routines, which perform tasks useful for the efficient operation of the machine, such as copying one magnetic tape from another.

Note, *Sales and Use Tax of Computer Software — Is Software Tangible Personal Property?,* 27 Wayne L. Rev. 1503, 1508 (1981) (the Wayne Note). (Footnote omitted).

instruction." *Id.* at 273. The representations might also be in machine readable form as a code on tape, disc or punched cards. The code might directly represent procedure oriented language or symbolic language which may be converted into machine instructions by operational programs called compliers or assemblers. The machine readable representation might also be in machine instructions, the binary code which the machine executes. *See generally* Gemignani, *Product Liability and Software,* 8 Rutgers J. Computers, Tech. & L. 173, 181-183 n.27 (1981).

The programs involved here are stipulated to be existing, prepackaged programs of general application, called "canned" programs. The stipulation further states:

> The programs assessed were not developed exclusively for use by Equitable but were developed to be sold to many different purchasers. None of the assessment for computer software relates to programs specially designed and developed exclusively for Equitable [, i.e., a custom program].

The advantage to a computer user of a canned program is that the user need not start from the beginning in developing the particular program. Reinventing the wheel is avoided. However, because the developer or proprietor is marketing a program for use by many different organizations of the same general type, and possibly for use on machines of various manufacture, there will ordinarily be a need for a particular user to make some adaptations in a canned program to meet the specifics of that user's situation. Equitable made some adaptations, but they are not described in evidence.

Each program received by Equitable was delivered to it on magnetic tape. This means that the proprietor of the program made a copy of it, directly or indirectly, from a master which was in some physical form. The physical form of the program copies, as delivered, was a coded series of magnetic impulses. Each code was readable by Equitable's computer

and seems to have been in machine instructions.[3] Equitable loaded the program copy tape into computer memory and started the process of adaptation. At that point, Equitable had no further need for the particular copy delivered from the standpoint of instructing its computer. That copy, however, was retained by Equitable.[4]

In order for a program to instruct computer execution, the magnetic tape copy of the program is loaded into memory. "In loading a program, nothing is taken from the storage media and nothing is added to the memory; rather, the user's computer reads the storage media and *rearranges its memory* to create a corresponding pattern of magnetic impulses." Note, *Software and Sales Taxes: The Illusory Intangible,* 63 B.U.L. Rev. 181, 189 (1983) (the B.U. Note) (Emphasis in original. Footnote omitted.). *See also* Note, *Software Taxation: A Critical Reevaluation of the Notion of Intangibility,* 1980 B.Y.U.L. Rev. 859, 871-72. The process of making changes to a program also takes place while the program is in memory. Equitable did not store the reproductions of the subject programs, or any adaptations thereof, in memory when they were not in use. They were stored peripherally. On any day when adaptations were made to a program, Equitable represents that it produced at least two tapes of the program, as changed. One was for storage on the computer premises, and the other was for storage off premises.

---

**3.** This conclusion is based on an interpretation of the contracts. AUXCO agreed to install "the computer object program modules of the System" on Equitable's equipment. If AUXCO went bankrupt or voluntarily dissolved, it agreed to deliver the source code to Equitable for Equitable's exclusive use. PACE agreed to deliver one set of its programs "in both source code and load module forms on magnetic tape . . . ." We take the term "source code" to mean the language, higher than machine language, in which the program was written. The distinction made in the contracts between the source code and the "object program modules" or "load module forms" indicates the latter to mean machine instructions. However, even if the magnetic coding of any program copy delivered on tape to Equitable was in a language higher than machine instructions, it had to have been translated by the computer into machine instructions. Such an additional step, if any, has no relevance to the legal issue here.

**4.** Each proprietor made certain express warranties in its contract with Equitable. This suggests the advisability of retaining the proprietor delivered copy of each program.

(2)

The Comptroller's position is that Equitable acquired tapes containing program copies. Magnetic tapes are tangible personal property. Acquisition of such tapes under the license agreements is a sale, because Art. 81, § 324 (d) provides that "sale" means "any transaction whereby title or possession, or both, of tangible personal property is or is to be transferred by any means whatsoever for a consideration including rental, lease, or license to use . . . ."

*Amicus* says that the transaction is a license to use the program, and that such a license is a form of intangible property. Equitable contends that the predominant purpose or essence of the transaction governs classification of the sale as involving either tangible or intangible property. In the transfer of computer programs via magnetic tape, the purpose is to obtain the program, an intangible, and not the tangible tape. In taking this position, Equitable is supported by the overwhelming numerical majority of reported cases applying tax statutes restricted to tangible personal property.

This Court has dealt with the taxation of programs once before. Computer software was involved in *Greyhound Computer v. St. Dep't,* 271 Md. 674, 320 A.2d 52 (1974), an ad valorem tax case. The property consisted of a computer, clearly tangible, and associated software, all of which had been acquired at a single price — a "bundled" transaction. Included in the software were programs, educational services and systems engineering services. The assessment had utilized the cost of the bundled transaction, without any allocation. We remanded for allocation between tangible and intangible property. What *Greyhound* teaches with respect to tangibility of programs is a subject on which unanimity is lacking among other courts and commentators. Later in this opinion we shall return to *Greyhound* for a more detailed analysis.

(3)

The starting point for our legal inquiry is the effect of the license agreements. There is no evidence that the subject programs are patented, or are part of any patent, even if we assume that programs can be patented. Nor is there any evidence of copyright.[5] Indeed the "license agreements" involved here were made years prior to the Software and Copyright Amendment of 1980, Pub. L. 96-517, 94 Stat. 3015, 3028 (codified at 17 U.S.C. §§ 101, 117). One purpose of the license agreements is to protect, by reliance on the law of trade secrets, the economic interest of the proprietors in the expression of the programs and in any ideas embodied therein. The proprietors do not want some pirates to be the ones making money from the proprietors' having developed the programs. Furnishing Equitable with a complete copy of each program on tape destroyed, as to Equitable, any secrecy in program expression. With a program copy on tape, Equitable was in a position to make further copies and to distribute them commercially, unless Equitable were contractually restricted. *See* Root, *Protecting Computer Software in the '80s: Practical Guidelines for Evolving Needs,* 8 Rutgers J. Computers, Tech. & L. 205, 225-29 (1981); R. Bernacchi & G. Larsen, *Data Processing Contracts and the Law,* at 74 (1974); *cf. Space Aero v. Darling,* 238 Md. 93, 110, 208 A.2d 74, 82, *cert. denied,* 382 U.S. 843, 86 S. Ct. 77, 15 L. Ed. 2d 83 (1965) ("A trade secret owner, however, does not abandon his secret by a limited public publication for a restricted purpose.").[6]

---

**5.** If the programs are in fact copyrighted, no intangible rights would be involved in the sale by the proprietors to Equitable of tangible tape embodying a copy of the copyrighted program. 17 U.S.C. § 202 (Supp. V 1981) in relevant part provides:

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object . . . .

**6.** Whether PACE also made disclosure by including in its documentation a copy of its programs in procedure oriented language printed on paper and readable by the human eye of a programmer is not disclosed by the record. AUXCO did not even furnish a tape copy of the source code.

*Space Aero* viewed breach of contract to be one basis for the law of trade secrets, in addition to abuse of confidence or impropriety in the means of procurement. 238 Md. at 113, 208 A.2d at 84. Here Equitable was willing to pay for copies of the programs on magnetic tape which the proprietors were willing fully to disclose to Equitable, if Equitable contractually restricted its use. Consequently, the licenses involved here do not grant intangible rights from the proprietors to Equitable. The licenses simply erect contractual limitations on the use which Equitable might otherwise make of the statutorily unprotected program copies it acquired by proper means.[7]

But while neither "license agreement" purports to transfer absolute legal title to anything, not even to the specific magnetic tapes used to deliver the program copies, Equitable has the right to use the specific tapes. This is a sale of the tapes under Art. 81, § 324 (d).

(4)

Equitable's principal argument is that this Court should conceptually sever the program copy contained on the magnetic tape from the tangible tape itself. The argument is that the transaction should be viewed as operating on two levels, one the transfer of intangible knowledge or information and the other the delivery of a tangible tape. To have a scalpel for this legal surgery, it would be necessary for us to adopt as part of Maryland sales tax law a principle that the buyer's predominant purpose for a transaction controls the classification of the acquisition as either tangible or intangible.

*Quotron Systems v. Comptroller,* 287 Md. 178, 411 A.2d 439 (1980) recognized a predominant purpose test as one of several factors in determining use tax applicability to the type of transaction presented there. That taxpayer undertook concurrently to render two types of interrelated

---

7. The foregoing analysis is more fully set forth in the B.U. Note, *supra,* 63 B.U.L. Rev. at 204-208.

performances. One was to maintain and continuously to update a computerized data bank of economic information, such as the selling prices of securities, which its customers could randomly access through remote terminals. The other was to install Quotron-owned hardware, including the remote terminals, on customers' premises for their use in requesting and receiving electronic transmissions of the economic data. We held that the first analytical step was to characterize the performances as a single, overall function, either rental of equipment or the provision of services. *Id.* at 186, 411 A.2d at 443. The dominant purpose was to obtain services and not to rent hardware. Based on that factor, on the taxpayer's retention of control over the hardware, and on the fact that Quotron's hardware could not be obtained without subscribing to the service, we concluded that the transaction was the provision of services. *Id.* at 188, 411 A.2d at 444. This approach is quite similar to that which we have used to determine whether a contract of sale is one for goods or for services under Art. 2 of the Uniform Commercial Code, where the performance involves both. See *Anthony Pools v. Sheehan,* 295 Md. 285, 455 A.2d 434 (1983); *Burton v. Artery Company,* 279 Md. 94, 367 A.2d 935 (1977). *Quotron* did not say that the dominant purpose of obtaining data made the subject of the contract intangible because information is intangible.

The rule of *Quotron* has been implicitly applied in the case at bar on an aspect which is not disputed by Equitable. In addition to providing program copies on tape, each proprietor agreed to furnish certain installation services. AUXCO also contracted to furnish a limited amount of training within the fixed contract price. Equitable does not argue, however, that these services predominate.[8] Any intel-

---

8. The *amicus* does make an alternative argument that the promised services control. However, there is no evidence to support that position. Equitable's motion in the circuit court to remand for additional evidence did not even proffer to show that the services promised to be rendered predominated over the program copies. Under the Comptroller's approach, services might predominate in a contract in which a software house specially designs and develops a program exclusively for a particular user.

lectual effort rendered in the past in developing the pro-
grams is now embodied in the products for sale, the copies of
the programs. That effort is reflected in the price for the
copies just as engineering costs of a model of a television
receiver are part of the selling price of a particular unit of
that model.

We have no doubt that the dominant purpose of the subject
transactions was to obtain a copy of the programs. But there
are problems in adopting a dominant purpose test in order
conceptually to sever information or data from the physical
medium employed to deliver a copy of the information, and
next to declare that the information predominates, so as
thereby to classify the transaction as a sale of intangible
property. One factor used in determining the dominant
purpose is the admittedly insignificant value of a blank mag-
netic tape when compared to the price paid for a program
copy on tape. But § 324 (i) defines "price" to mean

> the aggregate value in money ... promised to be
> paid or delivered by a purchaser to a vendor in the
> consummation and complete performance of a retail
> sale without any deduction therefrom on account of
> the cost of the property sold, cost of materials used,
> labor or service cost, or any other expense
> whatsoever.

While Equitable points out that the question of price is not
reached unless it is first determined that property sold is
tangible, the legislative policy embraced in the definition of
price runs contrary to the conceptual severing of the insig-
nificant blank tape from the valuable program copy
superimposed thereon as magnetic impulses.

A second concern is the precedent established for
apparently comparable transactions. If the dominant
purpose is to obtain knowledge, information or data which
thereby results in severing the dominant purpose object
from the physical medium of transfer, the analogy to books,
motion picture films, video display discs, phonorecords and
music tapes immediately comes to mind. In sales of the lat-

ter, the purchaser's dominant purpose ordinarily is to obtain the knowledge, information or data thereby conveyed. While the book is in human readable form, the other media are machine readable. A purchase of any of these information conveying media is within the imposition of the sales tax as tangible personal property. Such transactions escape taxation only if there is an applicable statutory exclusion or exemption. These analogies, however, have been argued to other courts which have held that tape copies of programs are intangible. We turn now to a consideration of the rationale of those opinions.

## (5)

The earliest decision, which set the tone for the later cases, is *District of Columbia v. Universal Computer Associates, Inc.,* 465 F.2d 615 (D.C. Cir. 1972). It involved a property tax on hardware which was assessed based on the cost of a bundled IBM data processing installation. Two programs were included, one the usual standard program and the other a custom tax program. Both programs were on punched cards. The court stated the legal issue to be "whether the two sets of punched cards (the software) represent tangible personal property ... or whether they represent intangible values which are not subject to tax." *Id.* at 617. The custom program was said to be basically a service. However, the canned program was said to represent "an investment of IBM in an intellectual property, which it licenses users like Universal to employ in the computers IBM sells." *Id.* at 618. Another factor of significance to the court was that

> [t]he punched cards themselves are placed in the machine and then taken out, and in fact could be returned to IBM. It is the information derived by the machine from the cards which stays in the computer, and which is employed repeatedly by the machine when it is used by [the taxpayer]. What rests in the machine, then, is an intangible —

> "knowledge" — which can hardly be thought to be subject to a personal property tax. The only visible evidence of that knowledge, the punched pasteboard, could be stacked in a warehouse, returned to IBM, or destroyed, without interfering with the efficiency of the computer machine to perform its designed function. [*Id.*]

Here the court is talking about memory in the computer. What rests in a programmed memory is not "knowledge" in any true sense of the word, but machine instructions. Further, the taxability of a sale of a canned program copy should not turn on whether the buyer stores the program in memory. A tax system cannot be administered dependent upon whether or not, at the time of the transaction, the buyer's intent is to store the program continuously in memory. Nor should taxability turn on the capacity of memory of the buyer's machine; otherwise, program copies bought for large storage machines would not be taxed, but those for small storage machines would be taxed.

The District of Columbia Circuit also concluded that both programs were to be likened to cartoon mats which had been involved in *Washington Times-Herald v. District of Columbia,* 213 F.2d 23 (D.C. Cir. 1954). Cartoon mats are the medium by which a cartoonist's drawings are transferred for reproduction in newspapers. *Washington Times-Herald* held that the sale of one time use of the mats was a sale of professional and personal services, because the price was paid for the work of the artist and not for the mats which had inconsequential value. Professor Jerome R. Hellerstein in his article, *The Scope of the Taxable Sale Under Sales and Use Tax Acts: Sales As Distinguished From Services,* 11 Tax L. Rev. 261, 275 (1956) has criticized the holding in *Washington Times-Herald,* saying that "[t]his rationale and holding undercut much established sales tax law." (Footnote omitted.)

An assessment of sales tax on the transfer of custom and canned, applicational programs, and of two operational programs, was abated in *Commerce Union Bank v. Tidwell,* 538

S.W.2d 405 (Tenn. 1976). The Tennessee court adopted all of the reasons advanced in *Universal Computer, supra,* including the characterization of a programmed memory as intangible knowledge, and added some additional reasons, the first of which may be called the alternative methods approach. A computer might be programmed *without* purchasing a copy of a program on any tangible medium. With appropriate equipment at both termini, a program could be reproduced in memory from electronic impulses conveyed over telephone lines; or the proprietor, working from a human readable copy which is not transferred to the customer, could manually type the program into the computer for compilation into machine instructions. Whether these alternatives are ways in which the business of selling programs is actually conducted need not presently concern us. Of significance is that the alternative methods approach does not determine taxability on the basis of a transaction's actual facts.

The tax collector argued the phonorecord analogy in *Commerce Union Bank.* In distinguishing, the Tennessee court said that the buyer has no viable method of bringing the particular music into his living room other than by the record, whereas the above-described alternative methods are available for acquiring programs. Secondly the court stated flatly that the tape containing the program copy "is not retained in the possession of the user." *Id.* at 408. This latter point is contrary to Equitable's representation of the facts in the instant matter. More importantly, intangibility should not be determined by the extent of use. After all, a book that is read only once is and remains tangible personal property. The court also said that the phonorecord is complete and ready for use at the time of purchase, while a program copy on tape "must be translated into a language understood by the computer." *Id.* We are at a loss to understand this distinction. A computer user purchases a canned program copy on tape because it is considered to be sufficiently compatible with the user's machine to be read by it and, either directly or after having been compiled, executed by it.

In 1977, an Alabama intermediate appellate court held that no use tax was payable on canned program copies acquired in the form of punched cards and magnetic tapes, because the purchase was of "the knowledge which went into the development of the eight programs, not the tapes and cards themselves." *State v. Central Computer Services, Inc.,* 349 So. 2d 1156, 1159 (1977). In part because the cards were destroyed and the tapes were returned after copies had been made on discs, the court conceptually severed the programs from the tangible media on which they had been copied by the proprietor for delivery to the buyer. This judgment was affirmed by the Supreme Court of Alabama in a 5-3 decision. *State v. Central Computer Services, Inc.,* 349 So. 2d 1160 (1977). The majority relied on the alternative methods analysis to distinguish that court's holding in an earlier case that the lease of motion picture films for exhibition was subject to sales tax. The dissenting judges pointed out that films can be transmitted by telephone lines or radio waves, so that the prior holding was not distinguishable.

The Arizona intermediate appellate court, in a 1977 decision, simply referred to computer software, including programs, as intangible property in a property tax case. Allocation was directed as to the assessment of a hardware manufacturer whose inventory had been valued from list prices for bundled installations. *Honeywell Information Systems, Inc. v. Maricopa County,* 118 Ariz. 171, 575 P.2d 801 (1977). The court made no analysis of the intangibility issue.

The authorities relied upon by Equitable also include cases that involve contracts with keypunch operations rather than software purchases. In *Bullock v. Statistical Tabulating Corp.,* 549 S.W.2d 166 (Tex. 1977), a sales tax case, customers brought copies of their business records to the taxpayer whose employees typed out on keypunch machines the data reflected on those copies to produce machine readable cards for use with the customers' computers. The taxpayer supplied the cards. It was held that "the true object of this transaction is not the data processing *card* . . . but the purchase of *coded* or *processed data,* an

intangible." *Id.* at 168 (emphasis in original). Obviously, the customers were not acquiring any new data. They were simply paying to have produced from a copy of the data furnished in human readable form another copy of the same data in machine readable form. *Janesville Data Center, Inc. v. Wisconsin Department of Revenue,* 84 Wis. 2d 341, 346, 267 N.W.2d 656, 658 (1978) is to the same effect ("[E]mbodied in the cards, tapes, and print-outs is the essence of the transaction . . . the purchase of coded or processed data, an intangible."). These courts seem to treat the machine readable form of the data as controlling intangibility. Neither opinion discusses the machine readable only, commercially purveyed, phonorecord or tape. Other courts have sustained collection of sales taxes from service bureaus. *Intellidata, Inc. v. State Board of Equalization,* 139 Cal. App. 3d 594, 188 Cal. Rptr. 850 (1983) held that keypunched cards delivered to the customer were tangible property produced to the customer's special order. *Accountant's Computer Services, Inc. v. Kosydar,* 35 Ohio St. 2d 120, 298 N.E.2d 519 (1973) involved sales tax on the tangible product of a service bureau which performed the keypunch operation and also produced reports. At issue was the applicability of an exemption which was not substantially different from Md. Code, Art. 81, § 326 (j), and which applied to " 'professional, insurance, or personal service transactions which involve the transfer of tangible personal property as an inconsequential element, for which no separate charges are made.' " *Id.* at 125 n.2, 298 N.E.2d at 523 n.2. Because the reports were valuable in and of themselves, and not because they had been produced by the taxpayer service bureau, personal service of consequence was lacking and the exemption did not apply. The court said the real object sought was rearrangement of the raw material.

When the purchase of canned programs on tape was presented to the Court of Civil Appeals of Texas in 1979, it held that no sales tax was due, based on *Statistical Tabulating Corp., supra.* The transaction was viewed as being "the purchase of the computer process, an intangible."

*First National Bank of Fort Worth v. Bullock,* 584 S.W.2d 548, 550 (1979). Phonograph record and filmstrip purchases were distinguished on the basis that when the information on the program tape "is transferred to the computer, the tape is no longer of any value or importance to the user." *Id.*

Canned programs were held not to be subject to the Illinois use tax in *First National Bank of Springfield v. Department of Revenue,* 85 Ill. 2d 84, 421 N.E.2d 175 (1981). In response to analogies argued by the tax collector the court said:

> It simply happened that, for the sake of convenience and easy handling, the programs were recorded on magnetic tapes. The tapes were certainly not the only medium through which the information could be transferred [the alternative methods analysis]. In this way, the tapes differ from a movie film, a phonograph record or a book, whereby the media used are the only practicable ways of *preserving* those articles. Thus, while those articles and the tapes are similar in that they physically represent the transfer of ideas or artistic processes, a more significant distinction is that those articles are inseparable from the ideas or processes, whereas computer programs are *separable* from the tapes. Not only may software information be conveyed any number of ways, but it may even be copied off of the tapes and stored, using another medium. ... In short, it is not the tapes which are the substance of the transaction, it is the information. [*Id.* at 91, 421 N.E.2d at 178-79 (emphasis added).]

We can take judicial notice, based on modern human experience, that the technology exists for producing a copy of a movie film on disc, of a phonograph record on tape, and of a book on microfiche. We have previously discussed how the program copy is not separated from the tape, when it is used in the computer. See B.U. Note, *supra,* at 188-89. To remove the program copy from the magnetic tape requires that it be overwritten, or obliterated in a magnetic field, in the way in which one dictating on tape makes corrections or wipes the tape clean.

*James v. Tres Computer Systems, Inc.*, 642 S.W.2d 347 (Mo. 1982), a 5-2 decision, held canned program tapes to be intangible and utilized the severance and alternative methods analyses. *First National Bank of Springfield* and the Alabama Supreme Court's decision in *Central Computer Services* were quoted to distinguish the film and record analogies.

A case departing from the analytical mold of the preceding authorities is *Maccabees Mutual Life Insurance Company v. State, Department of Treasury*, 122 Mich. App. 660, 332 N.W.2d 561 (1983) (per curiam). It is a use tax case involving tradenamed programs acquired from software proprietors. Consequently, adaptations had been made for the taxpayer's particular installation. The tangibility issue was presented on summary judgment with a concession by the tax collector that the programs, as adapted, were customized. It was held:

> The depositional evidence presented by plaintiffs illustrates that the software programs in question present a personalized service, customized to fit plaintiffs' particular computer configurations. . . .
>
> Customized computer software programs should be distinguished from canned software programs, *e.g.,* TV games, albums, and cassette tapes, because the latter are all end products in themselves. The focus of the instant transaction is on the personalized service of the software vendors, an intangibles transaction. [*Id.* at 666, 332 N.W.2d at 563-64.]

Here the parties have stipulated that the programs are "canned," by which they mean a program other than one originally developed exclusively for the buyer. While the record shows that adaptations were made to the programs acquired by Equitable, Equitable does not contend that services rendered to Equitable by the proprietors were of sufficient magnitude to classify either subject transaction as a purchase of services under the rule of *Quotron, supra.*

478

(6)

The tangible-intangible debate with respect to computer software can arise in contexts other than that of state and local sales, use and property taxes. The problem arises under the federal income tax as to eligibility for investment credit and accelerated depreciation. When the hardware manufacturers' segment of the industry unbundled their installation contracts and began separately to state prices for software, it was necessary for the Internal Revenue Service to adopt a position. Basically, bundled software is treated as part of the hardware, while unbundled software is treated as an intangible. *See* Rev. Proc. 69-21, 1969-2 C.B. 303; Rev. Rul. 71-177, 1971-1 C.B. 5; Bigelow, *The Computer And The Tax Collector,* 30 Emory L.J. 357, 362, 365 (1981).

Software, as embodied in tapes and documentation, has been held to be subject to the writ of replevin, over the objection that improved programs developed for the defendant's existing hardware were simply "a body of intangibles, that is, concepts or ideas . . . ." *F & M Schaefer Corp. v. Electronic Data Systems Corp.,* 430 F. Supp. 988, 992 (S.D.N.Y. 1977), *aff'd mem.,* 614 F.2d 1286 (2d Cir. 1979). *Cf. Institutional Management Corp. v. Translation Systems, Inc.,* 456 F. Supp. 661 (D. Md. 1978) (documentation of program replevied, without discussion of tangibility issue).

The severability argument is not a new one in sales tax cases. It has been rejected in a line of cases where those who rent motion picture films from producers have argued that the intellectual property or the right to use the copy transmitted for commercial exhibition should be severed from the tangible copy of the film. *See, e.g., Boswell v. Paramount Television Sales, Inc.,* 291 Ala. 490, 282 So. 2d 892 (1973); *Columbia Pictures Industries, Inc. v. Tax Commissioner,* 176 Conn. 604, 410 A.2d 457 (1979); *Florida Association of Broadcasters v. Kirk,* 264 So. 2d 437 (Fla. Dist. Ct. App. 1972); *United Artists Corp. v. Taylor,* 273 N.Y. 334, 7 N.E.2d 254 (1937); *Crescent Amusement Co. v. Carson,* 187 Tenn. 112, 213 S.W.2d 27 (1948). In the latter case the court reasoned that

[t]here is scarcely to be found any article susceptible to sale or rent that is not the result of an idea, genius, skill and labor applied to a physical substance. A loaf of bread is the result of the skill and labor of the cook who mixed the physical ingredients and applied heat at the temperature and consistency her judgment dictated. A radio is the result of the thought of a genius, or of several such persons, combined with the skill and labor of trained technicians applied to a tangible mass of substance. An automobile is the result of all these elements, and of patents, etc.; and so on, ad infinitum. If these elements should be separated from the finished product and the sales tax applied only to the cost of the raw material, the sales tax act would, for all practical purposes, be entirely destroyed. The material used in the making of a phonograph record probably costs only a few cents. The voice of a Caruso recorded thereon makes it sell for perhaps a dollar. To measure the sales tax only by the value of the physical material in this phonograph record is to apply an impossible formula. [*Id.* at 116-17, 213 S.E.2d at 29.[9]]

The movie film cases have been applied to reject the severability argument in the leasing of video tapes for television broadcasting. *See Turner Communications Corp. v. Chilivis,* 239 Ga. 91, 236 S.E.2d 251 (1977). A transfer of film negatives and master recordings used for making audio-visual aids for the training of medical personnel was held subject to sales tax, despite the purchaser's argument that its primary interest was not in the physical objects but in the right to exploit the intellectual products they embodied. *Simplicity Pattern Company, Inc. v. State Board of Equalization,* 27 Cal. 3d 900, 615 P.2d 555 (1980). That result, however, was aided by the fact that a statute, enacted

---

**9.** *Crescent Amusement* was distinguished by the Supreme Court of Tennessee in Commerce Union Bank v. Tidwell, *supra,* involving computer programs, because the latter were said to involve no product but only information, with the tangible tape as an incidental.

too late to apply to the transaction, limited the tax on master sound tapes and records to the amounts paid for tangible elements exclusive of copyrightable, artistic or intangible elements.

Artistic designs were purchased in transactions held to be subject to sales tax in *Columbus Coated Fabrics Division v. Porterfield*, 30 Ohio St. 2d 307, 285 N.E.2d 50 (1972). For use in decorative, vinyl coated wallcoverings that it manufactured, the taxpayer purchased designs, presented on paper or woven fabric, from independent artists and from design studios that were sources for designs in the clothing industry. Even though the purchased designs were the products of artists' talent and skill, and their value was determined by the quality and merit of the design and not by the inconsequential cost of the conveying medium, the court stated that "it is the product of the service, not the service itself, that the taxpayer is interested in." *Id.* at 310, 285 N.E.2d at 53.

On the other hand, at least two courts have held that a sales tax imposed on transfers of tangible personal property does not apply to mailing lists acquired for one time use and delivered on magnetic tape. *See Spencer Gifts, Inc. v. Director, Division of Taxation,* 182 N.J. Super. 179, 440 A.2d 104 (N.J. Tax Ct. 1981) (real object of the transaction involves intangible personal property); *Mertz v. State Tax Commission,* 89 A.D.2d 396, 398, 456 N.Y.S.2d 501, 503 (1982) (information was the essence of the transaction and tape was the medium of transmission).

At the administrative level, taxing authorities in at least 36 states, as of 1981, reportedly imposed a sales tax on software transfers. *See* White and Venecek, *Taxpayer Beware! The Current State of Computer Software Taxation,* 60 Taxes 373 (1982). According to the Wayne Note, *supra,* at 1531-36, as of 1977, 24 states taxed the sale of both canned and customer software, and 10 other states taxed canned software only.

(7)

From the standpoint of Maryland law, we conclude that the program copy acquisitions by Equitable are subject to sales tax for the following reasons.

We have indicated in parts (1) and (5) of this opinion both certain misconceptions in the technological underpinnings of the decisions holding taped copies to be intangible and our concerns with the apparent departures in reasoning from that usually applied in sales tax cases. Secondly, there is a substantial question whether the decision that set the course for the line of program cases, *Universal Computer, supra,* is consistent with existing Maryland law. That decision rested largely on *Washington Times-Herald* which held the acquisition of cartoon mats to be the purchase of personal services. Md. Code, Art. 81, § 326 (dd) exempts, *inter alia,* the sale of mats under circumstances therein set forth. The exemption was added by Chapter 530 of the Acts of 1973. At a minimum, enactment of the exemption indicates a legislative recognition that the sales tax statute could be applied to purchases of mats. Similarly, § 326 (k) exempts rentals of motion picture films to persons whose gross receipts are subject to amusement tax. The indication is that, absent the exemption, neither the artistic content nor the right to exhibit the film copy would be severed from the tangible medium and thereby placed beyond the reach of the sales tax act.

Additionally, this Court's discussion of computer software in the context of a bundled installation in the *Greyhound* case leads to the classification of the subject programs as tangible.[10] After noting the Maryland Tax Court's conclu-

---

10. Other courts have read *Greyhound* in different ways. *Compare* State v. Central Computer Services, *supra,* 349 So. 2d at 1160 ("Other jurisdictions have distinguished between computer software and tangible personal property [citing *Greyhound*]."); Honeywell Information Systems, Inc. v. Maricopa County, *supra,* 118 Ariz. 171, 575 P.2d at 803 ("There is little doubt that computer software is intangible property *** every jurisdiction which has considered the issue agrees [citing *Greyhound*]."); University Microfilms v. Scio Township, Washtenaw County, 76 Mich. App. 616, 619, 257 N.W.2d 265, 267 (1977) (plaintiff directs court to *Greyhound* which holds that computer software, i.e., cards, tapes, discs, are intangible); *with*

sion that software (programs, educational services and systems engineering services) was not severable from the hardware, we said (271 Md. at 677-78, 320 A.2d at 54-55):

> What is troublesome about [the tax court] approach is the fact that[,] while a substantial portion of the software is of a tangible nature, *i.e.,* punched cards, magnetic tapes, instructions covering operation or applications, [for property tax purposes] the remainder consists of personal services to be rendered after purchase . . . .

This passage reflects awareness of both operational and applicational programs, but makes no distinction between them as to their tangible nature, either in human readable documentation form or in machine readable tape or card form.

The *Greyhound* opinion went on to observe that

> [a] tenable argument may be made in support of the notion that at least that part of the tangible software which constitutes the operational program, without which a computer cannot operate, may have a value far in excess of that of the cards and tapes themselves, a value which represents large amounts expended by the manufacturer before the sale could take place for research, development, engineering, and the acquisition of expertise and skills. [*Id.* at 678, 320 A.2d at 55 (footnote omitted).]

This portion again refers to tangible software, only a part of which is the operational program. Impliedly, tangible software also can include applicational programs on cards or tape. *Greyhound* suggested a distinction in property tax valuation between operational and applicational programs for the purpose of allocating the cost of a bundled installation. The reason given was that a computer cannot operate

---

First National Bank of Springfield v. Department of Revenue, *supra,* 85 Ill. 2d at 92, 421 N.E.2d at 179 (*Greyhound* seen as "holding that only so much of software as consists of services is intangible and not taxable").

without the operational program. That reason would apply equally as well to applicational programs. With the operational programs, the computer has the capacity to operate, but in order actually to generate a specific type of report, it must be governed by an applicational program.

Then, at page 679 of 271 Md., 55-56 of 320 A.2d, this Court said:

> However, it cannot be ascertained from the record before us that portion of the purchase price attributable to such of the software as is tangible, or that portion attributable to that which is intangible.
>
> The difference between the two categories can best be delineated by a simple illustration. A privately commissioned recording, with no restriction on use, of a symphony played by a noted orchestra, has a value far in excess of that of the plastic disc or tape on which it is recorded, and would be subject to assessment for tax purposes at its full cash value. A privately commissioned performance of the same symphony by the same orchestra, however, although it might entail the same expenditure, would produce nothing tangible that could be reached by a tax on personal property.

Two concepts are involved in this passage, tangibility and cost. While the passage may be dicta, it was nevertheless expressed for the guidance of the agency on remand. Our analogy to a phonorecord recognized both its tangibility and its valuation based on cost, including the entire cost of the privately commissioned performance assumed in the illustration. Similarly, in the property tax context, a newly acquired phonorecord owned by a commercial radio station would be taxed as tangible personal property. The assessment would not be based simply on the value of its tangible material; rather, original cost less depreciation or its market value would be used.

The same is true in the instant matter. A tape containing a copy of a canned program does not lose its tangible character, because its content is a reproduction of the product of intellectual effort, just as the phonorecord does not become intangible, because it is a reproduction of the product of artistic effort. The price paid for a copy of a canned program reflects the cost of developing the program which the proprietor hopes to recover, with profit, by spreading the cost among its customers. Simply because the canned program on tape is much more expensive than the typical phonorecord, the program tape is not any less tangible.

The phonorecord analogy is directly addressed by Equitable. It says that in the case of the recording "*the intangible information has no value without the tangible record . . . .*" (Emphasis in original.) The same is true of the program copies Equitable acquired in the transactions being taxed. The millions of magnetic impulses which in their precise order have meaning were conveyed to the computer, in the transactions as carried out, by tapes. A meaningful sequence of magnetic impulses cannot float in space. Equitable's argument has merit, if the direct input by keyboard, without documentation, alternative (a service transaction) or the electronic transmission, without documentation, alternative (no tangible carrier) is the form of transaction under consideration. But, because a taxable transaction might have been structured in a nontaxable form, it does not thereby become nontaxable.

It is said each tape is used only once. But a dress pattern purchased at retail and used to make only one dress (or, even if never used) is taxable.

Equitable points to the provisions of the contract under which a delivery copy of a program, if lost or destroyed, will be replaced by the proprietor at minimal or no additional cost. On the other hand, the purchaser of a phonorecord which is lost or destroyed would have to replace it by paying the current price for another copy. This economic fact simply reflects that the proprietors of canned programs are better able to obtain thousands of dollars for a program copy by

eliminating the customer's risk of accidental loss. It would be overreaching to attempt to charge a second retail price when a replacement copy is reproduceable at minor cost.

Finally, Equitable argues that a purchased program "can be and was in fact *severed and exists apart* from the tangible transfer medium . . . ." (Emphasis in original.) As shown above, the copy delivered to Equitable does not become severed in any physical sense from the tape when the tape is used to structure computer memory.

We do not discern any legally significant difference for sales tax purposes between the canned computer program on magnetic tape and music on a phonograph record. As stated in the *National Commission on New Technological Uses of Copyrighted Works, Final Report* at 10 (1978): "Both recorded music and computer programs are sets of information in a form which, when passed over a magnetized head, cause minute currents to flow in such a way that desired physical work is accomplished." In the case of the phonograph record, the sales tax statute in Maryland has never been viewed as conceptually severing the copy of the performance from the tangible carrier. We conclude that the statute does not sever copies of computer programs from the tangible carriers employed in the subject sales.

> *Judgment of the Circuit Court for Baltimore City reversed.*
> *Case remanded to that Court for the entry of a judgment affirming the order of the Maryland Tax Court as to the assessment on computer programs.*
> *Costs to be paid by Equitable Trust Company.*