[No. A019177. First Dist., Div. Five. Nov. 27, 1984.]

GENERAL BUSINESS SYSTEMS, INC., Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**COUNSEL**

John K. Van de Kamp, Attorney General, Edward P. Hollingshead and Charles C. Kobayashi, Deputy Attorneys General, for Defendant and Appellant.

Alexander F. Eagle III and Eagle & Courtney for Plaintiff and Respondent.

Ronald J. Palenski, Milton R. Wessel, David A. Wormser, Mary Jane Desrosiers, Margarita O. Prado and Harold A. Galloway as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**HANING, J.**—Defendant/appellant State Board of Equalization (Board) appeals from a judgment granting plaintiff/respondent General Business Systems, Inc. (General) a refund of $50,256.27 in sales taxes paid and interest accrued. The Board claims a right, pursuant to section 1502, subdivision (f)(2) of title 18 of the California Administrative Code,[1] to tax transactions between General and its customers which result in delivery by General of computer punch cards to its customers. The trial court found the true object of the transactions to be the rendition of services, and concluded that the application of section 1502, subdivision (f)(2) was arbitrary, capricious, an abuse of discretion, and extended the Board's powers beyond its legislative authority. We agree and affirm the judgment.

The facts are generally undisputed. General, a sales agent of North American Phillips Corporation which manufactured the Phillips Model P-350 series office computer equipment, commenced business in 1972 as a seller of computer systems. In addition to selling computer hardware, General also developed and furnished applicational programs, a majority of which involved software application of accounting principles. Ninety percent of General's programs were furnished to customers who purchased its computer.

General custom-designed its applicational programs to fit the particular needs of a single customer. These custom programs were not existing, pre-written or canned packets which could be used by more than one customer without major modifications.

---

[1] Title 18 of the California Administrative Code section 1502, subdivision (f)(2) states: "*Custom Programs.* These are programs prepared to the special order of a customer. Tax does not apply to the transfer of custom programs in the form of written procedures, such as program instructions listed on coding sheets. Effective July 1, 1972, tax applies to the sale of custom programs transferred to the customer in the form of punched cards, or in tape, disc, drum, or similar form, or in the form of typed or printed sheets to be used as input media in an optical character recognition system."
All further references to section 1502 are to title 18 of the California Administrative Code.

The development of an applicational program generally occurred in four phases: (1) a survey and analysis of the customer's business needs; (2) the design of the system, including the drafting of necessary new business forms and reports; (3) the writing or coding of a series of computer instructions or commands which implemented the new system and the testing of the programs for errors; and (4) the installation, demonstration, and training of the customer's employees on the use of the new program and equipment.

Customers received each applicational program in the form of a set of computer punch cards which were used to install the computer program into the system. As stipulated by the parties, "The Phillips Model P-350 series computers [had] a limited storage capacity and, unless augmented with other equipment, could store only one program at a time. When the customer wished to switch from one program to another, the card set would be used to install the new program. Thus, a card set would be used [repeatedly] each time the customer wished to install that particular program."

General could have delivered the programs to its customers by other methods not involving the use of tangible personal property, including transmittal of the program through the computer's keyboard, over the telephone lines, or via a terminal. The card sets were used because they were a convenient and inexpensive medium available at the time.

On the sales proposals and customers' billings, General separately stated its charges for the applicational computer programs. However, it did not individually itemize the cost for each phase in the development of a program, such as systems analysis and employee training. The average cost of an individual software sale was between $3,000 and $6,000.

Prior to April 1975, General had not reported or paid taxes on its sales of applicational programs. After an audit for the period October 1, 1972, through March 31, 1976, the Board concluded that General "was liable for sales taxes on the unreported gross receipts from sales of applicational programs delivered in the form of computer punch cards." In response to General's petition for redetermination, the Board found it was liable for $33,329.91 in taxes and $16,926.36 in interest. As a result of this assessment, which it paid, General filed the instant action on December 4, 1979, requesting a refund.

The trial court found that "the true object sought by [General's customers] . . . was the services per se and not the punch cards upon which [General] delivered the programming;" that the computer punch cards "were only incidental to the services rendered," and "were simply a vehicle

of convenience, and not inseparable or essential" to the customers purchasing General's programming services; and that General's actions did not constitute the fabrication of punch cards, but "the simple use or consumption of the punch cards." Based on these findings, the trial court concluded that General's activities did not result in the "fabrication of labor," which would have been taxable pursuant to Revenue and Taxation Code section 6006, subdivision (f);[2] that "the application of [section 1502, subdivision] (f)(2) to [General's transactions] herein, was arbitrary, capricious, and an abuse of discretion" by the Board; and that such an enforcement of the above section "create[d] sales taxation on the rendition of services, and therefore said [section] extend[ed] the powers of the [Board] beyond its legislative authority."

The Board contends that, contrary to the lower court's findings and conclusions, section 1502, subdivision (f)(2) does grant it the right to tax General's sales of applicational software delivered in the form of computer punch card sets.

California imposes an excise or privilege tax on the retail seller, based on gross receipts of sales of tangible personal property. (§ 6051.) " 'Tangible personal property' means personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.) A "sale" includes "[a] transfer for a consideration of the title or possession of tangible personal property which has been produced, fabricated, or printed to the special order of the customer, or of any publication." (§ 6006, subd. (f).) "Pursuant to section 7051 [the Board] has adopted various administrative regulations that concern the sales and use tax in specific types of transactions. (Cal. Admin. Code, tit. 18, § 1500 et seq.)" (*Intellidata Incorporated* v. *State Bd. of Equalization* (1983) 139 Cal.App.3d 594, 597 [188 Cal.Rptr. 850].)

■ Among the administrative regulations promulgated by the Board is section 1502, subdivision (f)(2). However, General contends that the Board, through this section, has extended the sales and use tax law beyond that which the Legislature intended.

■ When an administrative agency promulgates a regulation in its enforcement of a statute, the regulation will not be disturbed by the courts, unless it is an "[im]permissible exercise of administrative discretion in car-

---

[2]Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

rying out the intent of the Legislature" which can be "characterized as arbitrary, capricious, or patently unreasonable." (*Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1020-1021 [106 Cal.Rptr. 867]; see also *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 92 [130 Cal.Rptr. 321, 550 P.2d 593].) ■ "Ordinarily, [a reviewing court gives] great weight to the interpretation of a statute by the administrative agency empowered to promulgate regulations to advance its purpose unless the interpretation is clearly erroneous." (*Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 8 [192 Cal.Rptr. 134, 663 P.2d 904].)

■ The enactment of section 6010.9 in 1982 supports General's contention that when the Board adopted section 1502, subdivision (f)(2), it extended its powers beyond the authority granted by the Legislature. Section 6010.9 states: " 'Sale' and 'purchase'. . . . do not include the design, development, writing, translation, fabrication, lease, or transfer for a consideration of title or possession, of a custom computer program, other than a basic operational program (as defined in Section 995.2), either in the form of written procedures or in the form of storage media on which, or in which, the program is recorded, or any required documentation or manuals designed to facilitate the use of the custom computer program so transferred." " 'Storage media' includes *punched cards,* tapes, discs, diskettes, or drums on which computer programs may be embodied or stored." (§ 6010.9, subd. (a), italics added.)

This law was enacted to "clarify" any uncertainty in the existing law regarding the application of the sales and use tax to the sales and services of custom programs. (Stats. 1982, ch. 1274, § 1, p. 4706.) The Legislature declared "that sales and service of custom computer programs, as defined in section 6010.9 of the Revenue and Taxation Code, other than basic operational programs, are service transactions not subject to sales or use taxes under any existing law. The use of any storage media in the transfer of custom computer programs is only incidental to the true object of the transaction, which is the performance of a service. Therefore, the Legislature, consistent with the statement of intent in Chapter 165 of the Statutes 1972, declares that [section 6010.9] is declaratory of, and not a change in, the existing law."[3] (Stats. 1982, ch. 1274, § 4, p. 4707.) Through section

---

[3]Statutes 1972, chapter 165, added sections 995 and 995.1 to the Revenue and Taxation Code, relating to property taxation of storage media for computer programs. Section 2 of this act contains the Legislature's intent not to tax computer programs, except basic operational programs: "Basic operational programs, like law books or other standard reference books, have value which is measurable, but any other programs, like an attorney's brief, and engineer's calculations, or business records, would be highly speculative." (Stats. 1972, ch. 165, p. 385.)

6010.9, the Legislature, with particularity, clarified the meaning of "sale" in section 6006, and "purchase" in section 6010.

The Board contends that *Intellidata Incorporated* v. *State Bd. of Equalization, supra,* 139 Cal.App.3d 594, specifically supports its right to tax General's sales of applicational computer programs delivered in the form of punch card sets. However, *Intellidata* is factually distinguishable from the instant action. *Intellidata* involved the contracting of keypunch services,[4] which is a taxable transaction pursuant to section 1502, subdivisions (d)(1)[5] and (d)(2).[6] General's case involves the design and development of custom computer programs which are implemented in the form of keypunch cards. The object of the transactions in *Intellidata* was the delivery of tangible personal property, namely the keypunched cards, while in the instant case the trial court found the true object was the rendition of services and not the fabrication of tangible personal property which would have been taxable pursuant to section 6006, subdivision (f). Title 18 of the California Administrative Code section 1501 states, in relevant part: ". . . The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the contract is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred. . . ." (See also *Albers* v. *State Board of Equalization* (1965) 237 Cal.App.2d 494 [47 Cal.Rptr. 69] and *Simplicity Pattern Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 900, 907-908 [167 Cal.Rptr. 366, 615 P.2d 555].)

Since the true object of the transaction in this case was the performance of services, the taxation of General's applicational software delivered in the

---

[4]In *Intellidata,* "[p]laintiff's customer delivered raw data such as sales invoices, inventory cards, billings, etc. Plaintiff was instructed on what information from each such business record must be transposed onto computer-readable keypunch cards." (*Intellidata Incorporated* v. *State Bd. of Equalization, supra,* 139 Cal.App.3d at p. 596.) The customer specifically requested that the information be put on computer punch cards. (*Ibid.*)

[5]Section 1502, subdivision (d)(1) states: "*General.* Generally tax applies to the conversion of customer-furnished data from one physical form of recordation to another physical form of recordation. Generally tax does not apply where original information is developed from customer-furnished data, unless the original information is incorporated into a form of tangible personal property of physical use to the customer."

[6]Section 1502, subdivision (d)(2) states, in relevant part: "*Keypunching and Keystroke Verifying.* This section covers situations where a service bureau's agreement provides only for keypunching, keystroke verifying, and proof listing of data, or any combination of these operations. It does not include contracts under which these services are performed as steps in processing of customer-furnished information as discussed under (d)(5). . . ."

form of punch cards was an extension of the Board's powers beyond its legislative authority. The trial court was correct in ruling that General was entitled to a refund.

The judgment is affirmed.

Low, P. J., and King, J., concurred.

A petition for a rehearing was denied December 21, 1984, and appellant's petition for a hearing by the Supreme Court was denied February 20, 1985.