INTERNATIONAL BUSINESS
MACHINES CORPORATION,
Appellant,

v.

DIRECTOR OF REVENUE, STATE OF
MISSOURI, Respondent.

No. 70386.

Supreme Court of Missouri,
En Banc.

Feb. 14, 1989.

Byron E. Francis, St. Louis, for appellant.

William L. Webster, Atty. Gen., Richard L. Wieler, Asst. Atty. Gen., Jefferson City, for respondent.

WELLIVER, Judge.

This is an appeal from a final decision of the Administrative Hearing Commission (Commission) involving the construction of a revenue law of the state of Missouri. We have exclusive jurisdiction. Mo. Const. art. V, § 3.

Appellant, International Business Machines Corporation, (IBM), is a corporation organized and existing under the laws of the state of New York and authorized to conduct business in the state of Missouri. IBM's business includes, among other things, the marketing of several types of computers as well as the sale and licensing of large numbers of computer software programs to customers in the state of Missouri.[1]

For a customer who used a "mini" or "mainframe" computer, IBM would offer the customer the choice of a number of computer software programs, for specific tasks such as payroll, inventory control, etc., as well as operational programs.[2] Evidence before the Commission demonstrated the procedure for supplying a customer with this type of computer program would begin with an IBM marketing representative visiting the customer to determine what the customer needed in terms of specific software requirements. IBM has its various types of computer software listed in a Software Directory. The customer would choose the type of software required, and an IBM systems engineer would then be responsible for insuring the technical requirements of the software, for

1. The types of models of computers IBM markets can be described as "micro", "mini", and "mainframe" computers. "Micro" computers, also recognizable as "personal computers", are the least complex, followed by "mini" and then "mainframe". Only software involving the "mini" and "mainframe" models are at issue in this appeal.

2. Application software is usually aimed at completing specific tasks, such as preparing a payroll. The operational programs, also known as "operating systems", act as the controller of the computer, for instance directing memory to get data from a disc, allocating space on the disc, etc. We will not make a distinction between the two types here.

example making sure the software is adapted to the specific customer's type of machine. The computer software program, once assembled,[3] is then delivered to the customer via disc, diskette, tape, or punched cards. Once the customer has programmed his computer, the instruction says he is to return the tapes to IBM.

For 1981 and 1982, IBM paid sales tax on all software programs licensed to Missouri customers. In 1983, IBM then made refund requests in the amounts of $25,926.28 and $1,424,662.00. Both claims were denied by the Director, at which time IBM appealed to the Commission. After the Commission affirmed the denial of the refund, IBM sought review in this court. We affirm.

## I.

A review of the case law shows taxability determinations are made based upon various reasons. One line of cases establish the general rule that all software is an intangible. *See District of Columbia v. Universal Computer Associates, Inc.*, 465 F.2d 615 (1972); *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn.1976); *First National Bank v. Dep't. of Revenue*, 85 Ill.2d 84, 51 Ill.Dec. 667, 421 N.E.2d 175 (1981); *Greyhound Computer v. St. Dep't.*, 271 Md. 674, 320 A.2d 52 (1974). *Maccabees v. Treasury Dep't.*, 122 Mich. App. 660, 332 N.W.2d 561 (1983); *State v. Central Computer Services, Inc.*, 349 So. 2d 1156 (Ala.Civ.App.1977); In the *Matter of the Protest of Strayer*, 239 Kan. 136, 716 P.2d 588 (1986); *First National Bank of Fort Worth v. Bullock*, 584 S.W.2d 548 (Tex.Civ.App.1979); *Detroit Automobile Interinsurance Exchange v. Department of Treasury*, 138 Mich.App. 696, 361 N.W. 2d 373 (1984); *General Business Systems Inc. v. State Board of Equalization*, 162 Cal.App.3d 50, 208 Cal.Rptr. 374 (1 Dist. 1984); *In the Matter of the Appeal of AT & T Technologies, Inc.*, 242 Kan. 554, 749 P.2d 1033 (1988).

Another line of cases stand for the opposite, namely that computer software is tangible property. *See Chittenden Trust Company v. King*, 143 Vt. 271, 465 A.2d 1100 (1983); *Comptroller of the Treasury v. Equitable Trust Company*, 296 Md. 459, 464 A.2d 248 (1983); *Citizens and Southern Systems Inc. v. South Carolina Tax Commission*, 280 S.C. 138, 311 S.E.2d 717 (1984); *Pennsylvania and West Virginia Supply Corp. v. Rose*, 368 S.E.2d 101 (W.Va.1988); *Hasbro Industries, Inc. v. Norberg*, 487 A.2d 124 (R.I.1985).

Still other cases hold "canned" programs constitute tangible property, and "custom" programs do not, *Measurex Systems, Inc. v. State Tax Assessor*, 490 A.2d 1192 (Me. 1985), and others tax only the operational software, while not taxing the application software, *Strayer, supra.*

The wide divergence of results demonstrates both the importance of and the necessity for state legislatures updating their taxing laws in terms of modern technology. The divergent results suggest that as a matter of policy, a good case can be made for taxing the use of all software, none of the software, or only part of the software.[4]

## II.

IBM's sales tax refund request alleged the refund was due because "the fact that this tax amount was paid in connection with the marketing of computer programs and such activity has been declared not subject to tax in *James v. Tres Computer Systems Inc.*, No. 63662 (Mo.Sup.Ct. Dec. 3, 1982)". [642 S.W.2d 347 (Mo. banc 1982)]. IBM's broad reason supporting their request for refund was correctly interpreted by the Commission to preclude determination of issues not raised in *Tres*.[5] No question regarding whether IBM sold,

---

3. The assembly process involves three different areas of IBM combining their information and integrating it into the finished customer software product. The process is not important for us here except to note testimony established that software found in the Software Directory is used as the starting point, then modified, if required, to fit the individual customer.

4. Subsequent to the years here involved Missouri has applied 12 CSR 10–3.588, not here involved.

5. All grounds for refund, as well as all claims for refund, must be raised first with the Director of Revenue. The Commission may not decide claims filed for the first time before

leased, rented, or licensed the software was properly before the Commission, and hence is not before this court.

The Commissioner examined whether the tapes were the ultimate object of the sale, and whether the fact that the programs could have been delivered over telephone lines shielded the programs from tax. These were the only issues in *Tres* the Commissioner thought reviewable.

### A. Tangibility and *Tres*.

In *Tres*, the issue was not whether the software involved in the case was tangible or intangible. The parties stipulated that the software was intangible. The other issue examined by *Tres* was whether the manner by which the software was delivered to the customer changed it from intangible to tangible personal property. Judge Donnelly, writing for the majority, found that the software remained intangible and was not subject to the tax. The various possible forms for delivering the software, by tapes, by discs, by diskettes, or by telephone were all examined and the court concluded that the fact that the software could be delivered in many different ways did not effect the substantive nature of what was attempted to be taxed.[6] In addition to the fact that the software itself had been stipulated to be intangible personal property, the *Tres* court emphasized the evidence of customization of the software and the fact that the process of customizing bore more of the characteristics of a service transaction than a sale of property.[7]

### B. Tangibility and IBM.

The evidence in the present case does not support an attempt to classify the pro-

grams like those in *Tres*. IBM lists its programs in a Directory, and after the particular customer selects a program, existing canned programs may be modified to fit the particular customer's needs.

Q: I got the impression from your testimony that you take, you have a book of an inventory of basic plan programs—

A: Yes.

Q: —from which a customer selects? You then look at your library card to find out the type of computer hardware that he has, all existent programs that he has stored in the computer, and then you tailor this pre-planned packaged inventory item so that it will operate in conjunction with this computer and his other program?

A: That is correct.

On the evidence before us, we can only conclude that modifications of cataloged software were minimal, if any. The Commissioner found the modifications were related to fitting programs together so that all programs would operate together and in synchronization with each other, and that modifications were not made to the basics of the program structure. There appears little similarity to the programs in *Tres*.

■ The Commissioner also found the tapes to be the ultimate objects of the transactions, noting the crucial role the tapes play in the bargaining process. The tapes were ready to use to program the customer's machine, which is another difference from *Tres*.[8]

The second point examined by the Commissioner was the "alternative methods of delivery argument"—the possibility that

---

them, nor may the Commission rule on grounds not presented to the Director of Revenue. *St. Louis Southwestern Railway Co. v. State Tax Commission*, 713 S.W.2d 830, 831–2 (Mo. banc 1986); *Floyd Charcoal Company, Inc. v. Director of Revenue*, 599 S.W.2d 173 (Mo.1980).

**6.** Sometimes called the "alternative methods" approach, this was considered in *Tidwell, supra*, and relied on in *Tres*. It has been criticized as focusing on what could have been, rather than what actually happened, with the end result being the actual facts of the transaction play little or no role in the taxability determination. *See Equitable Trust, supra*, 464 A.2d at 255.

**7.** Focusing on a service-nonservice line of reasoning also demonstrates why the value of the tapes themselves would be irrelevant to a taxibility determination. This focus would also render irrelevant what happens to the tape after the programming function is complete.

**8.** Both *Tres* and *Tidwell* considered the "severability argument", which separates the program stored on the media from the media itself in order to classify the program as intangible, since if the media which the user employs to program his machine can be discarded after use, then the focus should be on that which "was" on the media rather than the media itself.

this software could have been delivered to the customer via telephone lines. The "alternative methods" argument has been considered in several cases. *See Maccabees, Central Computer, Bullock,* and *Tidwell, supra.* It is questionable whether this issue is before us. IBM stipulated that the only manner by which the programs were delivered was by tapes, discs, diskettes or punched cards. None were delivered by telephone lines. While there was evidence that there were printed instructions on the tapes to the effect that they must be returned to IBM, the instructions also said for the customer to copy the tape and retain the copy as a backup. We see no distinction between keeping the original tape and copying the tape and returning the original copy. As a matter of fact, IBM conceded that it made no effort to enforce the "return to IBM" instruction.

■ A decision of the Administrative Hearing Commission is to be upheld when authorized by law and supported by competent and substantial evidence upon the whole record. *Daily Record Company v. James,* 629 S.W.2d 348 (Mo. banc 1982). After reviewing the entire record we agree with the Commissioner that IBM failed to carry its burden of proof of establishing the software in question to be either "customized" or a "service" which would bring it within the holding of *Tres.* As the Commissioner noted:

> Despite the reference by the *Tres* court to the high degree of technology and complexity which surrounds any understanding of computer programs, there was no expert testimony or technical evidence of any kind offered by either party

which would describe or define computer programs generally or the specific computer programs involved in this proceeding ... Respondent called no witnesses and offered no exhibits. Petitioner's only witness testified not as to the design and formulation of a computer program but to its marketing and distribution.

The judgment of the Administrative Hearing Commission is affirmed.

BILLINGS, C.J., and BLACKMAR, RENDLEN, HIGGINS and COVINGTON, JJ., concur.

ROBERTSON, J., concurs in result.

---

*See District of Columbia, Tidwell, 1st National Bank of Springfield.* This line of argument has been criticized for focusing on the program in machine memory, as opposed to the condition of the program when transferred to the user. Another problem with this line of analysis is the belief the program has some existence once removed from the media, when in fact the program is never actually removed from the media during the programming function. The program exists on the disc as a series of coded magnetic impulses, it is "an ordered arrangement of matter requiring the allotment of a specific amount of mass and volume". Testimony by IBM before the Commissioner established the computer actually rearranges its memory

based on the magnetic impulses it reads from the media. *See* Note, "Software and Sales Taxes: The Illusory Intangible" 63 B.U.L.Rev. 181, 188–90 (1983) (citations omitted).

The fact that the program in use by the machine is resident in the machine and not dependant on the media used to program the machine is irrelevant to sales tax determination. It is a result of applying the severability argument which causes the focus to shift to a point beyond the sale, ending up with attempting to determine taxability, and tangibility, on where a given copy of the program is being stored. Where the program is "stored" is not the relevant question. *Equitable Trust, supra,* 464 A.2d at 255.