**DISTRICT OF COLUMBIA, Petitioner,**

v.

**UNIVERSAL COMPUTER ASSOCIATES, INC., Successor to Commercial Ventures, Inc., Respondent.**

**No. 24896.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 11, 1972.

Decided June 15, 1972.

As Amended July 31, 1972.

Mr. Kenneth A. Pels, Asst. Corp. Counsel, with whom Messrs. C. Francis Murphy, Corp. Counsel, and Henry E. Wixon, Asst. Corp. Counsel, were on the brief, for petitioner.

Mr. James S. Chalmers, Sr., for respondent.

Before FAHY, Senior Circuit Judge, WILKEY, Circuit Judge, and RONALD N. DAVIES,* U. S. Senior District Judge for the District of North Dakota.

WILKEY, Circuit Judge:

This case comes to us on petition by the District of Columbia for review of the decision of the District of Columbia Tax Court, holding that 50% of the purchase price of the respondent Universal's computer and accompanying "software" is properly allocable to taxable "tangible personal property," and 50% of the purchase price is to be ascribed to non-taxable intangible values. Whatever the complexities of computer science, we think the answer here is clear, in spite of the absence of light from guiding precedent and that the applicable statute [1] is vintage 1922.

I.

For the sum of $289,836 Universal bought from IBM a data processing unit. This included the computer machine itself (the hardware) and two sets of punched cards (the software) used to program the computer. One set of the punched cards was the usual standard program developed by IBM for this computer. Another set of punched cards contained a special tax program, devel-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. D.C.Code § 47–501 provides:

> For the purpose of defraying such expenses of the District of Columbia as Congress may from time to time appropriate for, there hereby is levied for each and every fiscal year, a tax at such rate on the real and personal property subject to taxation in the District as will, when added to the other taxes and revenues of the District, produce money enough to enable the District to pay promptly and in full all sums directed by Congress to be paid by the District, and for which appropriation has been duly made; and the Commissioners of the District of Columbia hereby are empowered and directed to ascertain, determine, and fix annually such rate of taxation as will, when applied as aforesaid, produce the money needed to defray the share of the expenses of the District during the year for which the rate is fixed; and the Commissioners of the District shall, in accordance with existing law, cause all such taxes and revenues to be promptly collected and, when collected, to be daily deposited in the Treasury to the credit of the District for the purposes herein set out. (June 29, 1922, 42 Stat. 669, ch. 249.)

oped jointly by personnel of IBM and Universal. Of the total price of $290,000, the sum of $106,000, represents estimates of the cost of the special tax program. To the standard cards usually available with this computer IBM retained title; Universal was not free to transfer these cards or to make available the information contained thereon to third parties. To the special tax program cards and the information contained thereon Universal did obtain title, and was free to transfer or utilize the information in any way it saw fit.

Computers can be programmed by punched cards, electronic tapes, or discs on which the information to be stored in the computer is placed. Or, theoretically, a computer could be programmed originally by an operator working from instructions known only to him, although this would be much more laborious and time-consuming. With this particular model computer the punch cards are fed into the computer, the information contained thereon is recorded in the inner operations of the machine; at the completion of the process the computer is programmed. The cards are then stored separately and have no further use, unless at some future date it becomes necessary to insert the same program into the machine. Once the machine is programmed, then it is ready to be employed in the work for which it was purchased.

The legal issue here is whether the two sets of punched cards (the software) represent tangible personal property and are thus subject to the D.C. personal property tax, or whether they represent intangible values which are not subject to tax. The District of Columbia Tax Court held that the software represented intangible values and was not subject to the personal property tax. Since the computer machine itself unquestionably is tangible personal property and subject to tax, the Tax Court had to make an allocation of values between the hardware (the computer machine) and the software (the intangible value of the information stored on the cards).

It allocated 50% each to the hardware and software, thus making the original taxable value of the computer approximately $145,000, to be depreciated at the usual rate each year after the date of purchase.

## II.

We conclude that the District of Columbia Tax Court was correct both as to its determination as to the nontaxability of the intangible values represented by the information stored on the punched cards, and in the allocation of 50% of the value of the whole package to the software.

It appears to us that the material of the punched cards themselves is of insignificant value. It was for the intangible value of the information stored on the cards that Universal paid IBM. How the information was created, who has title to it, and how the information is put to the computer machine—all support this appraisal.

A. The Work of IBM's experts in developing the tax information to be put on the punched tax program cards was estimated to be worth $106,000. The punching of the cards themselves, like the cost of the pasteboard and the feeding of them into the machine, is insignificant compared to the time consumed, the skill used, and the inherent value attached to the process of creating the information. What Universal paid for, what IBM charged for, and the value which is or is not subject to tax, is the intangible value created by the intellectual effort in creating this special tax program to go on the cards.

B. Title to the tax program, the intellectual property designed for Universal specially, and which it helped create, was transferred completely to Universal. On the other hand, title to the standard information customarily used in this model computer machine was retained by IBM; under terms of the contract Universal could not transfer either the information or the cards physically to a third party. The standard information on this set of cards was developed by

IBM over a period of years at a cost of many millions of dollars. While the cost of the development is thus not ascertainable individually in relation to Universal, it represents an investment of IBM in an intellectual property, which it licenses users like Universal to employ in the computers IBM sells.

C. The punched cards themselves are placed in the machine and then taken out, and in fact could be returned to IBM. It is the information derived by the machine from the cards which stays in the computer, and which is employed repeatedly by the machine when it is used by Universal. What rests in the machine, then, is an intangible—"knowledge"—which can hardly be thought to be subject to a personal property tax. The only visible evidence of that knowledge, the punched pasteboard, could be stacked in a warehouse, returned to IBM, or destroyed, without interfering with the efficiency of the computer machine to perform its designed function.

We think computer software, then, can be likened to the cartoon mats involved in *Washington Times-Herald v. District of Columbia,* in which this court *en banc* held that cartoon mats which were sold by publishing syndicates to individual newspapers were not tangible personal property for purposes of the D.C. sales tax. Judge Miller expressed the rationale of our court:

> The syndicates sold to the Times-Herald the right to reproduce one time the work of artists who make the drawings. *They simply sold the professional and personal services* of the artists whom they had under contract and in so doing transferred title to the mats, of inconsequential value, from which the drawings could be reproduced. *The price was paid for the artists' work,* i. e., for the right to reproduce the impressions on the mats, —not for the mats themselves. The newspaper bought the creation of the

artist—not the material on which it was impressed—and the right to reproduce it. Without that right, the comic strips mats would be entirely worthless. (Emphasis supplied.)[2]

We think that the knowledge stored on computer cards, tapes, or discs is even more demonstrably intangible intellectual property than the right to reproduce from the cartoonist's drawings involved in *Washington Times-Herald.*

While in *District of Columbia* v. *Norwood Studios* the transfer of films was held subject to the sales tax, it was distinguished from *Washington Times-Herald.* Judge Edgerton said:

> The present case is different. The producer of the films retains no interest in them and imposed no restriction on their use. They became the property of [the purchasers] without qualification.[3]

In *Norwood Studios* the purchaser of the films was free to make use of the films as many times as he desired, and to sell the films themselves to third parties. In *Washington Times-Herald* the newspaper acquired the right to reproduce the cartoon only once. In the case at bar Universal can use the information on the standard IBM cards, but cannot divulge the knowledge or transfer the cards to a third party; Universal can transfer the special tax program cards or the knowledge contained thereon to a third party, because it paid IBM for their expert services and Universal's own experts participated in developing the knowledge that went on these particular cards; IBM has no use for them otherwise and attached no limits to the transfer of the knowledge to Universal and its computer. Universal, like IBM with the knowledge on the standard cards, could license others to use the cards, but retain title to and control of them. Thus both type cards, the standard IBM and special tax program owned by Universal are the same type intellec-

2. Washington Times-Herald v. District of Columbia, 94 U.S.App.D.C. 154, 155, 213 F.2d 23, 24 (1954).

3. District of Columbia v. Norwood Studios, Inc., 118 U.S.App.D.C. 358, 359, 336 F.2d 746, 747 (1964).

tual property as the mats in *Washington Times Herald*. In all respects we think the case at bar is similar to *Washington Times-Herald* and not to *Norwood Studios*.

That the above is the correct tax treatment is reinforced by two other considerations. Since 1969 IBM has followed the practice of billing software in its sales separately from the sale of hardware in the computer line. More importantly, the Internal Revenue Service has promulgated a specific rule permitting the separation of software and hardware for depreciation purposes, which is precisely the problem involved here with the D.C. personal property tax.[4] Under IRS rules hardware (the computer machine itself) is depreciated on a regular schedule, while the development of software, such as the tax package here (the intangible knowledge residing in punched cards, tapes or discs) may be taken as a deductible expense in the single year of purchase, much like an expenditure for personal services. The billing by IBM and the treatment by Internal Revenue for tax purposes would seem to establish that only the computer machine itself is tangible personal property; the software is intangible knowledge not subject to personal property tax.

### III.

Lastly, turning to the 50-50% allocation of the values between the hardware and the software, there is evidence in the record sustaining the Tax Court's determination of this issue. While we have no indication of the value placed by IBM on the computer machine itself and the standard software package in this sale in 1966, we do know that out of the total purchase price of $290,000, it was estimated that $106,000 represented the cost of the services rendered by IBM in the development of the tax program package. There was testimony that hardware in the computer field generally amounts to only about ten or twenty percent of the purchase price; somewhat contradictorily and with a high degree of mathematical uncertainty, there was also testimony that software "in some cases goes up as high as fifty or fifty-five percent of the total purchase price." The record shows that the special software tax package was so important that Universal would not have accepted the computer without it.

Whether the total software be taken as having a value of eighty or ninety percent of the purchase price of $290,000, or the software value be assumed to be fifty or fifty-five percent, or it be calculated that the special tax package (the development costs of which were estimated to be $106,000) plus whatever value can be ascribed to the standard software package would total more than 50% of the entire purchase price, the record shows that the District would be entitled to tax no more than 50% of the package total value as hardware. The record thus can be read to

4. Rev.Proc. 69–21, 1969–2 Cum.Bull. 303, provides in pertinent part:
   Sec. 4 Costs of Purchased Software.
   0.1 With respect to costs of purchased software, the Service will not disturb the taxpayer's treatment of such costs if the following practices are consistently followed:
   1. Where such costs are included, without being separately stated, in the cost of the hardware (computer) and such costs are treated as a part of the cost of the hardware that is capitalized and depreciated; or
   2. Where such costs are separately stated, and the software is treated by the taxpayer as an intangible asset the cost of which is to be recovered by amortization deductions ratably over a period of five years or such shorter period as can be established by the taxpayer as appropriate in any particular case if the useful life of the software in his hands will be less than five years.
   Under the above-quoted Revenue Procedure, the Internal Revenue Service will not require a taxpayer to separate the software from the hardware, but it does consider the software to be an "intangible asset" which can be separated from the hardware if the taxpayer so desires. Whether, for IRS purposes, the original costs must be separately stated is immaterial to the issue under the D.C. tax law.

support the Tax Court's 50-50% allocation, which means that respondent Universal must pay a personal property tax based on an initial value of $145,000 for the computer machine itself. With a different set of facts, King Solomon did no better in making a similar choice.[5]

Affirmed.