349 So.2d 1160 (1977)
In re STATE of Alabama
v.
CENTRAL COMPUTER SERVICES, INC.
Ex parte State of Alabama.
SC 2395.
Supreme Court of Alabama.
September 9, 1977.
*1161 William J. Baxley, Atty. Gen., Herbert I. Burson, Jr., Counsel for Dept. of Revenue, and Asst. Atty. Gen., Ron J. Bowden, and John J. Breckenridge, Asst. Counsels, Dept. of Revenue, and Asst. Attys. Gen., for petitioner.
Marshall Timberlake of Balch, Bingham, Baker, Hawthorne, Williams & Ward, Birmingham, opposed.
TORBERT, Chief Justice.
This court granted the petition for writ of certiorari in this case because it involved a material question of first impression in this state, that question being whether computer "software" constitutes tangible personal property for purposes of the state use tax as set out in Title 51, section 788, Code of Alabama 1940 (Recomp.1958). The Court of Civil Appeals answered this question in the negative. We affirm.
Central Computer Services, Inc., a subsidiary of Central Bank of Alabama, paid $236,400.00 to University Computing Company of Texas for a ninety-nine year license for the use of eight computer programs. Each program consisted of a set of instructions recorded on magnetic tapes and punched cards. This computer "software" was used to program Central Computer Services' computer which provides data processing services for banks affiliated with Central Bancshares of the South, Inc.
Upon receipt of the "software," Central Computer Services extracted the information contained on the magnetic tapes and punched cards, and transferred the programs to magnetic discs owned by Central Computer Services. The tapes were then returned to University Computing Company and the cards were thrown away.
Pursuant to Title 51, section 788, Code of Alabama 1940 (Recomp.1958), the State Department of Revenue entered a use tax assessment against Central Computer Services in the amount of $13,519.91 for its purchase of the eight computer programs.
Central Computer Services appealed this assessment to the Circuit Court of Jefferson County. That court reversed the assessment, ruling that computer "software" was intangible and that the purchase of such "software" was not subject to the use tax on tangible personal property.
The Court of Civil Appeals, 349 So.2d 1156, sustained this ruling of the trial court, stating that what was purchased by Central Computer Services was the information or knowledge which went into the development of the eight programs and not the magnetic tapes and punched cards themselves. Further, the appeals court noted that the magnetic tapes and punched *1162 cards were merely the means by which this information or knowledge was transferred.
The State contends that the Court of Civil Appeals erred when it concluded that the "software" was intangible and thus not subject to the tax. The State argues that the magnetic tapes and punched cards are a necessary, integral part of the computer program and that because these items are tangible, there was a purchase of taxable tangible personal property by Central Computer Services.
The only Alabama case relied upon by the State for its proposition of law that computer "software" is tangible and taxable is Boswell v. Paramount Television Sales, Inc., 291 Ala. 490, 282 So.2d 892 (1973). In that case, this court held that the leasing of movie films and tapes by Paramount, a California corporation, to television stations in Alabama involved the leasing of tangible personal property rather than an intangible right to publish as Paramount argued.
We believe that magnetic tapes and punched cards are distinguishable from movie films. In Boswell, the court noted that the right to publish or broadcast the motion picture was physically inseparable from the movie film itself. The physical presence of the movie film is essential to broadcasting the intangible artistic efforts of the actors. However, in the present case, the physical presence of magnetic tapes and punched cards is not essential to the transmittal of the desired information from its creator at University Computing Company to Central Computer Services. Testimony in the present case indicates that this information can also be telephoned to the computer or brought into Alabama in the mind of an employee of University Computing Company.
In summary, we find in the present case that there is an incidental physical commingling of the intangible information sought by Central Computer Services and the tangible magnetic tapes and punched cards themselves. We therefore hold that the essence of this transaction was the purchase of nontaxable intangible information.
As previously stated, this is a case of first impression in Alabama. However, we are not without case authority from other jurisdictions to support our holding that computer "software" is not taxable tangible personal property. Several courts have dealt with this issue in factual situations identical to the one presently before this court.
The Supreme Court of Tennessee recently held that specialized computer "software" purchased by a bank is not tangible personal property subject to that state's use tax in Commerce Union Bank v. Tidwell, 538 S.W.2d 405 (Tenn.1976). The underlying rationale for that decision was stated by the Tennessee court in the following manner:
"When the information is transferred from the tape to the computer, the tape is no longer of any value to the user; and it is not retained in the possession of the user. The information on the tape, unlike the phonograph record, is not complete and ready to be used at the time of its purchase. It must be translated into a language understood by the computer. Once this information has been translated and introduced into the computer and the tapes returned or the punch cards destroyed, what actually remains in the computer is intangible knowledge; this is what was purchased, not the magnetic tapes or the punch cards. District of Columbia v. Universal Computer Associates, Inc., 151 U.S.App.D.C. 30, 465 F.2d 615 (1972). Transfer of tangible personal property under these circumstances is merely incidental to the purchase of the intangible knowledge and information stored on the tapes." (538 S.W.2d at 408.)
In District of Columbia v. Universal Computer Associates, Inc., 151 U.S.App.D.C. 30, 465 F.2d 615 (1972), the United States Court of Appeals for the District of Columbia held that computer "software" was not subject to the District of Columbia personal property tax on tangible property. Concerning the nature of the "software," that court stated the following:

*1163 ". . . It is the information derived by the machine from the cards which stays in the computer, and which is employed repeatedly by the machine when it is used by Universal. What rests in the machine, then, is an intangible"knowledge"which can hardly be thought to be subject to a personal property tax. The only visible evidence of that knowledge, the punched pasteboard, could be stacked in a warehouse, returned to IBM, or destroyed, without interfering with the efficiency of the computer machine to perform its designed function." (151 U.S. App.D.C. at 33, 465 F.2d at 618.)
We hold that computer "software" does not constitute tangible personal property for purposes of Title 51, section 788, Code of Alabama 1940 (Recomp.1958). The decree of the Court of Civil Appeals is hereby affirmed.
AFFIRMED.
JONES, ALMON, SHORES and EMBRY, JJ., concur.
MADDOX, FAULKNER and BEATTY, JJ., dissent.
BLOODWORTH, J., recuses himself.
MADDOX, Justice (dissenting).
I cannot distinguish this case from Boswell v. Paramount Television Sales, Inc., 291 Ala. 490, 282 So.2d 892 (1973). Central Computer Services, a subsidiary of Central Bank of Alabama, paid $236,400 for a 99year license for the use of eight computer programs from University Computing Company of Texas. This so-called "application software" is tangible personal property, in my opinion. Such programs can be the subject of theft. Hancock v. State, 402 S.W.2d 906 (Tex.Cr.App.1955).[1]
The problem we face today of trying to decide whether applications software is "tangible" or "intangible" is admittedly a difficult one and the problem had its genesis with an "unbundling" announcement made by IBM in 1969, the effect of which is discussed in a Note in the Suffolk University Law Review, Vol. IX, pp. 119-144, entitled, The Revolt Against the Property Tax on Software: An Unnecessary Conflict Growing Out of Unbundling.
"Prior to 1969, when the industry was in its developmental stages, hardware occupied the center of attention, while software was relegated to an incidental service supplied by the computer manufacturer in support of the hardware. This was perhaps a natural tendency. Laymen could relate quite easily to the physical manifestations of the computer with its crisp modern styling much as they would to a new model automobile. The more sophisticated attempted to understand design features and performance characteristics from the descriptive literature and manuals. However, it was a relatively small group of cognoscenti who understood how to get the computer to do useful work and how to control and maximize its efficiency. Apparently relishing their Merlin-like role, this latter group made little effort to increase understanding, while the others were content to concentrate on other areas.
Two factors contributed to this shortsighted position. First, the emphasis of the industry was clearly on developing a smaller, more reliable computer that consumed less energy and which could be produced at less cost. Thus, in the span of approximately fifteen years, the industry put forth three `generations' of hardware, each one based on improved technologyvacuum tubes, transistors and integrated circuits. The capacity of the hardware of each generation to digest ever increasing quantities of data resulted in less attention being paid to methods that would increase the efficiency of the successive models of hardware.
*1164 "The second factor was that in this early period, computer users, as a group apart, were noticeably `clubby' in that they formed associations oriented towards a particular manufacturer's equipment in order to share experiences and discuss problems. A natural offshoot of these associations was the free interchange of computer programs so that the other fellow would not have to `reinvent the wheel.' This milieu was in large part due to the fact that the earliest computer applications were in the educational and scientific sectors of the market, which are generally characterized by full and free disclosure and immediate publication.
"The start of the development of software as a distinct entity within the industry can be traced to 1969 when IBM announced a comprehensive plan for the separation of prices for its computers and related services including certain types of software. Prior to that time it was standard industry practice to price only the data processing equipment itself (the hardware) and to include, at no additional cost, `a variety of services.' Such services, furnished free by the manufacturer, normally included customer engineeringthe adaptation of the data processing system to the user's environment both physically, in terms of computer room layout and requirements, and conceptually, in terms of meeting the user's application needs. Maintenance of the equipment and training of the user's personnel were also included in the equipment price. Most importantly, however, both systems and applications software were furnished at no cost. This packaged price policy became known within the industry as `bundled' pricing. Hence, after the 1969 IBM announcement, the price separation of hardware from software and services became known as `unbundling.'
"The evolution of relative independence for software was hastened by the introduction of third generation hardware (built around integrated circuits) which had the capability of performing multiple tasks simultaneously. This dynamic development intensified the pressure on equipment manufacturers to offer systems software that could optimize the hardware capability. The most important boost forward, however, came from the development of higher level programming languages which permitted `machine independence, or, at least,. . . ease of transferability from one computer to another.' These languages expanded the effectivity of programming efforts in that programs, formerly written on an individual basis for a particular computer, could now be utilized on many computersboth those within the manufacturer's `family' and those made by competing manufacturerswith minimum modification. In concert, these two developments ushered in the beginning of a software industry. It was now possible for those systems and applications programmers with an entrepreneurial bent to establish themselves in business without being irrevocably tied to one manufacturer's hardware." (footnotes omitted.)
As software assumed an independent posture, a confrontation developed between computer manufacturers and purchasers and local taxing authorities. This case specifically points up the problem.
I candidly admit that some other courts, when presented with the problem we face here, have classified applications software as "intangibles." The majority opinion naturally cites these cases, and I cannot fault them for this, because they do support the result they reach. But for Boswell v. Paramount Television Sales, Inc., supra, I would consider these other cases to be persuasive, too. Even so, I still think those cases from other jurisdictions follow a traditional approach to defining "tangibles" and "intangibles" when we are living in a "computer age." In any event, I believe that Paramount Television Sales controls, and that the majority has not adequately distinguished it.
The majority says that in Paramount the film was actually brought into the state and *1165 that here the "knowledge" could have been (although it was not) transmitted by a telephone line or personnel could have come to Alabama and designed the program. The same could have been true in Paramount. We all know that films can be transmitted by telephone lines or radio waves across state lines, also. Likewise, the actors in Paramount could come into Alabama and perform and produce the film. Does that make the product produced, the saleable item, an intangible? I think not. Here, the cards and tapes had value because of what was contained on them. In Paramount, the film had value because of what was contained on it. In Paramount, some type of "hardware" had to be used in order to get the "knowledge" off the film. I cannot distinguish Paramount, therefore, as easily as the majority does.
In short, the cards and tapes here, although they require a piece of hardware to use what is contained on them, have tremendous value over and above the cost of the physical tapes and cards. Central Computer Services thought so, too. It paid $236,400 for those cards and tapes.
I would reverse the judgment of the Court of Civil Appeals.
FAULKNER and BEATTY, JJ., concur.
NOTES
[1] In Hancock v. Decker, 379 F.2d 552 (5th Cir. 1967), the defendant, on appeal from a denial of a petition for habeas corpus, claimed he had not stolen property of a value in excess of $50. The Fifth Circuit affirmed the denial of the petition.