631 So.2d 1340 (1994)
SOUTH CENTRAL BELL TELEPHONE COMPANY,
v.
Sidney J. BARTHELEMY, et al.
No. 93-CA-1072.
Court of Appeal of Louisiana, Fourth Circuit.
January 27, 1994.
*1341 Gregory D. Guth, Deputy City Atty., Bruce E. Naccari, First Asst. City Atty., Kathy Torregano, City Atty., New Orleans, for Sidney J. Barthelemy, et al.
William M. Backstrom, Jr., Edward D. Wegmann, Rosemarie Falcone, Jones, Walker, Waechter, Poitevant, Carrere & Denegre, New Orleans, and Keith G. Landry, BellSouth Corp., Atlanta, GA, for BellSouth Telecommunications, Inc. d/b/a South Cent. Bell Telephone Co.
BYRNES and JONES, JJ., and JOHN A. DIXON, Jr., J. Pro Tem.
JOHN A. DIXON, Jr., Judge Pro Tem.
The issue in this appeal is whether computer software programs licensed for use by a business are tangible personal property under the City of New Orleans Code of Municipal Ordinances and, therefore, subject to a use tax. Also at issue is whether maintenance services provided for the software programs are taxable services.
In October 1990, the City notified Bell South Telecommunications, Inc. d/b/a South Central Bell Telephone Company (SCB) of a proposed assessment of taxes for, among other things, SCB's use of computer software and payments for maintenance of software for the taxable periods beginning on January 1st, 1986 and ending on April 30, 1990. SCB paid the full amount of the proposed tax[1] under protest.
SCB sued to recover the entire protested payment.
In August 1992, SCB filed a motion for partial summary judgment[2] challenging the City's assessment of tax on payments for the license of and maintenance services for two kinds of software programsswitching system software[3] and data processing center *1342 software.[4] The City also filed a motion for summary judgment on the same issues.
In a December 22, 1992 judgment, the trial judge denied the City's motion for summary judgment and granted SCB's motion for partial summary judgment, finding that the licensing of the data processing and switching software is not subject to the City's sales/use tax. On February 9, 1993, the trial judge amended the judgment to clarify that the maintenance services with respect to the software are not taxable and to enter judgment in favor of SCB and against the City in the amount of SCB's protested payment. The City appeals the December 22, 1992 and February 9, 1993 judgments. We affirm.

FACTS:
The uncontested facts are that SCB owns and operates a telephone system in Louisiana and is engaged in the business of providing telephone service for compensation. As SCB explains, its "system" consists of many individual systems connected together with other systems to form a local, state, national and international network. At a telephone central office, telephone lines are connected by equipment which function to "switch" or route each call over the company's network to the line of the subscriber corresponding to the number dialed by the calling party. The routing is performed electronically by computer controlled "switches" housed in each central office. Each telephone central office is unique and processes telephone calls differently from other telephone central offices.
Each of the switching system software programs at issue was licensed for use by SCB at a specific telephone central office. All licenses for the right to use switching system software were contracted for and granted separately from the sale of any equipment or other item or article of tangible personal property. And, all charges for the right to use the switching system software were separately stated on each invoice or other billing record from the price of any equipment or other item of tangible personal property sold to SCB.
The switching system software programs at issue provided by the vendors were transmitted to SCB by electronic impulses on magnetic tapes. Apparently the switching system software programs could have been transmitted electronically and/or telephonically without the use of any tangible medium or could have been input directly into a processor by representatives of the vendor. Once SCB received the switching system software on magnetic tapes, the electronic impulses of intelligence on the tapes were transferred and loaded into SCB's switching system processors. The magnetic tapes were used or discarded by SCB. Most of the vendors billed City taxes on the price of magnetic tapes and other articles of tangible personal property delivered to SCB. If a vendor failed to bill for City tax, SCB's mechanized payments and tax reporting system automatically accrued City taxes.
Each switching system software program was specifically tailored according to the unique requirements specified by SCB for a particular telephone central office. The vendors retained ownership of and proprietary rights to each of the switching system software programs licensed to SCB. The license agreements restricted SCB's use of the programs in various ways.[5]
SCB also acquired the right to use data processing center software from various vendors. SCB's right to use this software was acquired through BellSouth Services, Inc., an affiliate of SCB, who would test, evaluate and adapt the software before transmitting it to the center in New Orleans. Unlike the switching system software, this software was transmitted electronically via telephone lines to New Orleans. The software vendors retained ownership and proprietary rights to *1343 each of the data processing software programs.

ANALYSIS:
The basic issue on appeal is whether computer software is tangible personal property as defined in Section 56-18 of the City Code. This provision states:
"Tangible personal property" means and includes personal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses. The term "tangible personal property" shall not include stocks, bonds, notes or other obligations or securities.
Under Section 56-21 of the City Code, taxes are imposed upon the lease or rental of tangible personal property and upon the sale of services within the City, as well as the sale at retail, the use, the consumption, the distribution and the storage in the City of each item or article of tangible personal property. "Tangible personal property" as used in the City Code is synonymous with corporeal movable property as defined in La.C.C. art. 471. City of New Orleans v. Baumer Foods, Inc., 532 So.2d 1381, 1388 (La.1988).
The City argues that because the magnetic tapes, upon which the switching system software programs were placed, are corporeal movable property, the City can impose a tax on the programs. SCB responds that because it is undisputed that computer programs are "intellectual property" and therefore incorporeals, the programs are not taxable. Although the City's position is not without support in caselaw from other jurisdictions,[6] SCB's, as well as the trial judge's, viewpoint is more reasonable.
Taxing statutes, which necessarily include definitional limitations like the one at issue, must be construed liberally in favor of the taxpayer and against the taxing authority. Goudchaux/Maison Blanche, Inc., v. Broussard, 590 So.2d 1159, 1161 (La.1991); Tarver v. World Ship Supply, Inc., 615 So.2d 423 (La.App. 4th Cir.), writ denied, 616 So.2d 672 (La.1993). The computer programs at issue in this case simply do not fall within the definition of tangible personal property. They do, however, fall within the definition of incorporeal property as "intellectual property." See, District of Colombia v. Universal Computer Assoc. Inc., 465 F.2d 615, 619 (D.C.Cir.1972), and Commerce Union Bank v. Tidwell, 538 S.W.2d 405 (Tenn.1976), both cases holding that intangible information stored on magnetic tapes or punchcards is not taxable.
The City's argument that the switching system software programs are part of the magnetic tapes on which they were delivered and should be grouped together with the relatively insignificant cost of the tapes and taxed as tangible personal property has been rejected by a number of courts. See, for example, James v. Tres Computer Service, Inc., 642 S.W.2d 347 (Mo.1982); First National Bank of Springfield v. Dept of Revenue, 85 Ill.2d 84, 51 Ill.Dec. 667, 421 N.E.2d 175 (1981). That the vendors who wrote the programs encoded the electronic impulses representing the program instructions onto magnetic tapes solely for delivery purposes is irrelevant to determining whether the software is tangible personal property. Rather, because the programs cannot be utilized by SCB until they have been copied into the memory of the electronic telephone switch, the magnetic tapes are inconsequential elements of the transactions.
Instead of focusing on the means for delivering software, courts should look the "essence of" or the "real object" of the transaction to determine taxation. The trial judge in the instant case reasoned that "under the essence of the transaction test that neither the data processing software nor the switching software is subject to the sale/use tax of the City of New Orleans."
Contrary to the City's assertion, the court, in McNamara v. Electrode Corp., 418 So.2d 652 (La.App. 1st Cir.), writ denied, 420 So.2d 986 (La.1982), embraced an "essence of the transaction" or "real object of the transaction" test, concluding that, given the facts in the case, the real object or essence of the transaction was the acquisition of tangible personal property.
*1344 In Electrode, the corporation leased technical equipment called dimensionally stable anodes to customers in Louisiana. The anodes were installed in large chlorine/caustic soda producing units called cells. Contracts with all of the customers were labeled "Anodes Lease Agreement." Contracts with two of the customers, in addition, were labeled "Technology and Patent License Agreement." The technology and patents which were the objects of the latter agreement presumably represented technological "knowhow" that went into the development and manufacture of the tangible anodes. The lessor/taxpayer and its customers were attempting to separate the technological knowhow from the anodes themselves to avoid Louisiana tax on the portion of the lease payments which they attributed to the technology.
The court determined that the transfer of technology without the tangible personal property (the anodes) was worthless and thus the technology, an intangible item, was merely incidental to the tangible item and subject to Louisiana tax. The court concluded that the true object of the contracts, regardless of their label, were the anodes. 418 So.2d at 662. The alleged technology or know-how, the court recognized, was an inseparable part of the hardware (anode) and for that reason must be included as part of the total price of the lease of the anodes. 418 So.2d at 662-663. No breakdown between "intangible technology" and "tangible personal property" was allowable in this case. Id.
The facts in the instant case are distinguishable from those in Electrode. In Electrode, the intangible property, the technological know-how, was inseparable from the tangible personal property, the anodes. In the instant case, the software programs are separable from any tangible property, including the magnetic tapes on which the switching system software programs were delivered. In fact, once the programs were copied from the magnetic tapes into the memory of the computer processors, the magnetic tapes were disposable. In the instant case, unlike Electrode, the real object of each license agreement was the right to use the program, not the acquisition of the magnetic tapes. The real object was intangible property.
The City argues that computer software is essentially the same as motion pictures, books, VCR tapes, phonograph records, cassette tapes, compact discs and Nintendo games. Some courts have use this reasoning, others have rejected it. Nevertheless, as to each of the items listed above, the true object and essence of each transaction is the purchase of the tangible medium itself, not the intangible property. Without the tangible mediumthe tape, disc, reel, etc., the intangible propertythe artist's expressionsis useless. Hence, these items are justifiably taxable whereas the programs in the instant case are not.
Moreover, as SCB asserts, the software programs at issue were separable from the magnetic tapes on which they were delivered. Indeed, the switching system software programs were not actually used by SCB until they are separated from the magnetic tapes and copied into the memory of the switching system hardware. The software programs at issue are clearly distinguishable from the examples given by the City. The City's analogy is without merit.
The City purports to establish a distinction between "canned" software versus "custom" software. Canned software, or pre-made programs, is what the City claims is at issue in this case instead of custom programs, those made for a particular customer. Assuming there is a relevant distinction in this regard, the uncontroverted facts in this case tend to establish that the programs at issue were a combination of canned and custom programs. The programs were pre-made, but apparently significant adaptations were required before SCB could use them. At any rate, a distinction between canned or custom programs comes from a few cases from other jurisdictions. The City Code is silent on this issue.
The City also contests the trial judge's finding that maintenance services to computer software are not taxable. The City imposes a sales tax on a limited number of services. See, Section 56-21 of the City Code. Section 56-15(7) of the City Code imposes limits on the taxing of repair services to *1345 repairs of tangible personal property. Assuming this type of maintenance service can be considered repair service, the software licenses obtained by SCB are intangible property and thus, not taxable. The services at issueupdating, enhancing and reformatting the software and advising SCB on various usages of the softwaredo not fit well into the concept of "repair". The maintenance services at issue are not taxable.

CONCLUSION:
The software programs are not subject to City taxes because the computer software at issue is not tangible personal property and is not encompassed within the definition of what is taxable in the City Code. Moreover, the programs are separable from the magnetic tapes on which they were delivered and the real object and essence of each transaction involving the software was the acquisition by SCB of a license of the right to use the software. The City, therefore, has no authority to impose a tax on these transactions. Likewise, taxing maintenance services for the software is not authorized nor correct.
Accordingly, the judgment granting SCB's motion for partial summary judgment is affirmed, and the tax assessed on SCB's license of and maintenance to the software programs, paid under protest, must be refunded by the City.
AFFIRMED.
BYRNES, Judge, dissenting.
I respectfully dissent. The City has the right to tax "tangible personal property." Code of the City of New Orleans, Section 56-18.[1] South Central Bell argues that certain computer software is incorporeal and, therefore, non-taxable. In agreeing with South Central Bell, the majority misperceives the concept of "right of intellectual property" as found in LSA-C.C. art. 461.[2]
The majority opinion makes the common error of confusing the software itself with the right to the software, or to use non-civilian terminology which is perhaps more commonly understood, the majority opinion confuses the notion of the software copy with the software copyright, for "right of intellectual property" as used in LSA-C.C. art. 461 is equivalent to the concept of "copyright." It is a copy of the software that operated the telephone central office equipment, not the software copyright.[3]
*1346 The Civil Code uses the term incorporeal only in reference to legal rights which are purely conceptual in nature as opposed to the objects of those rights. LSA-C.C. art. 461, 470, 473.
As the noted civilian scholar Professor Cynthia Samuel said of the difference between the copy and the copyright to computer software:
"The exclusive rights that constitute the intellectual property known as copyright are different from rights to a particular copy of the copyrighted work.... In other words, by acquiring a copy of a copyrighted work, one does not acquire the copyright, the intellectual property." (Emphasis added).
Cynthia Samuel, Louisiana's Offense Against Intellectual Property: What Exactly Is The Offense and Is It Preempted by the United States Copyright Law?, 37 La.Bar Journal No. 3, 157, 158 (1989).
It is not the copyright to the software that the City is attempting to tax, but the copy itself. South Central Bell makes it abundantly clear that it transferred copies of the software to the users. South Central Bell in its supplemental brief acknowledges that "the software programs were the essence, or real objects, of the transactions on which the City seeks to impose the use tax."
South Central Bell and the majority opinion rely on First Nat'l Bank of Springfield v. Dept. of Rev., 85 Ill.2d 84, 51 Ill.Dec. 667, 421 N.E.2d 175 (1981), which was wrong when it stated that:
"The [computer] tapes were certainly not the only medium through which the information could be transferred. In this way, the [computer] tapes differ from a movie film, a phonograph record or a book, whereby the media used are the only practical ways of preserving those articles. Thus, while those articles and the tapes are similar in that they physically represent the transfer of ideas or artistic processes, a more significant distinction is that those articles are inseparable from the ideas or processes, whereas computer programs are separable from tapes. Not only may software information be conveyed any number of ways, but it may even be copied off of the tapes and stored, using another medium...." [Emphasis added]
Either this opinion is hopelessly outdated or the Illinois court was grievously deficient in its knowledge of the capabilities and potentials of modern technology. The pronouncements of the Illinois Court to the contrary notwithstanding, it is now common knowledge that books, music, and even movies or other audio/visual combinations can be copied from one medium to another.[4] They *1347 are also all available on computer in such forms as floppy disc, tape, and CD-ROM. Such movies, books, music, etc. can all be delivered by and/or copied from one medium to another, including electrical impulses with the use of a modem. Assuming there is sufficient memory space available in the computer hard disc drive such movies, books, music, etc. can all be recorded into the permanent memory of the computer such as was done with the software in this case.[5] By adopting the faulty reasoning of the Illinois Court the majority opinion would prevent the City from taxing not only all forms of computer software whether in the form of floppy discs, tapes, CD-ROM, or even Nintendo games; but also virtually all forms of media with intellectual content, including records, audio tapes, video tapes, compact discs and laser disc, as all may now be transferred from one medium to another with the aid of technology currently available to the general public. It would indeed be a tragedy if this economic disaster were to be heaped upon the already impoverished City because this Court chooses to adopt the faulty reasoning of the Illinois Court along with numerous other common law authorities cited in the majority opinion which failed either to foresee or to grasp technological advances which are now common place in countless ordinary households; not to mention the fact that such common law cases are totally inappropriate authorities upon which to base our Civil Code definitions of "corporeal" and "incorporeal."[6]
*1348 The form that the copy takes does not make it any less a copy as distinguished from the "right to intellectual property", i.e., the copyright. Nor does the way in which it is delivered to the user alter the fact that it is the copy and not the copyright that was transferred. It was not the copyright that South Central Bell was delivering by tape or by modem, but a copy of the software. It is not the copyright, but the copy of the software that makes the telephone central office switching systems work. It is not a mere idea to be comprehended. Sommers v. Secretary, Dept. of Revenue, 593 So.2d 689, 692 (La.App. 1 Cir.1991).
There was a time not so long ago when even learned men did not know that gasses and the air we breath have substance even though their constituent particles could not be seen with the unaided eye. Gasses can now be measured (tangible) and gas meters are commonplace. With the aid of powerful electron microscopes, molecules, atoms, and even subatomic particles of the air we breath may be seen and photographed. Likewise, with the aid of modern technology, the physical existence of the South Central Bell computer software can be made perceptible to the senses.
We no longer view electricity and electromagnetic phenomena as magical occurrences or the manifestation of the will of mythical gods.[7] Anyone who does not believe that electricity can be felt (tangible) has never experienced an electric shock or been struck by lightning. Anyone who does not believe it can be measured (tangible) does not have an electric meter on his residence. Electricity moves and can be moved from place to place and is, for that additional reason corporeal. LSA-C.C. art. 471; Sommers v. Secretary, Dept. of Revenue, 593 So.2d 689 (La.App. 1 Cir.1991).
In defining tangible, "seen" is not limited to the unaided eye, "weighed" is not limited to the butcher or bathroom scale, and "measured" is not limited to a yardstick.
The codal terms "corporeal" and "incorporeal" ante date the advent of computer technology. A great advantage of civilian methodology is that our Civil Code was intended to be flexible enough to adapt to new situations. The redactors of the Civil Code foresaw that the unforeseen would occur. The code is in this way self-evolving as it expands to reflect our expanding knowledge of the physical world as we approach the twentyfirst century. "Corporeal" and its legal equivalent "tangible" should be understood as encompassing all things that make up our physical universe, as opposed to "incorporeals" which are limited to the non-physical world of legal concepts.
The definition of "tangible personal property" as defined by the City Code employs more modern, less legalistic terminology, i.e., "personal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses."
The South Central Bell software has physical existence, i.e., it is corporeal or tangible. It takes up space on a magnetic tape or on the user's hard drive. It can be moved from place to place. LSA-C.C. art. 471. Sommers v. Secretary, Dept. of Revenue, supra. It makes physical things happen. As the majority opinion states: "Each telephone central office is unique and processes telephone calls differently from other central offices." Make a change in the copyright law and the software would remain unchanged. *1349 Make a physical alteration in the software and the calls would be processed differently or not at all. The software can be used only in its physical form. It is the physical copy of the software that makes the equipment work, not the "right of intellectual property" or the copyright. As noted previously, South Central Bill in its supplemental brief acknowledges that "the software programs were the essence, or real objects, of the transactions on which the City seeks to impose use tax." It is South Central Bell's characterization of the software as incorporeal/intangible that is incorrect. Arguably, the encoded copy of the software is even more "tangible" or "corporeal" than a copyrighted book or a copyrighted piece of sheet music. While books and sheet music are purely passive in nature, the copy of the software makes things happen in the telephone equipment, i.e., it causes physical phenomena to occur or alters the course of physical events.
The importance of this case cannot be exaggerated. For the foregoing reasons I would reverse the judgment of the trial court.
NOTES
[1] SCB paid $961,029.99 in tax, interest, penalties, and audit cost.
[2] SCB's right to proportionate interest, penalties and costs on the proposed tax assessment for the computer software and any other amounts of tax at issue is still before the trial court.
[3] To direct the operations of the switching system hardware, SCB licensed a limited right to use switching system software from various switching system software vendors. The switching system is the complex method by which telephone calls are routed through one of the 16 telephone central offices in Orleans Parish.
[4] SCB operates a data processing center in Orleans Parish to process customer billings and payments, store and manage customer data and maintain a voucher and disbursement system, as well as other accounting functions. The data processing software guides the functions of computers located at the data processing center.
[5] Each license agreement prohibited SCB's sublicense, assignment, sale or other transfer of the program. Also, SCB was restricted in its use of the software only to designated pieces of hardware. SCB had to maintain strict confidentiality of programs it licensed and could not use the programs after the license expired.
[6] Citizens and Southern Systems, Inc. v. South Carolina Tax Commission, 280 S.C. 138, 311 S.E.2d 717 (1984) and Chittenden Trust Co. v. King, 143 Vt. 271, 465 A.2d 1100 (1983).
[1] Sections 6-18 of the City Code defines "tangible personal property" as:

"Personal property which may be seen, weighed, measured, felt or touched, or is in any other manner perceptible to the senses. The term `tangible personal property' shall not include stocks, bonds, notes, or other obligations or securities."
The term "tangible personal property" as used in said Section 56-18 of the City Code is synonymous with "corporeal movable property" as defined in LSA-C.C. art. 471. City of New Orleans v. Baumer Food, Inc., 532 So.2d 1381 (La.1988).
[2] LSA-C.C. art. 461 defines the distinction between "corporeals" and "incorporeals" as follows:

"Corporeals are things that have a body, whether animate or inanimate, and can be felt or touched.
Incorporeals are things that have no body, but are comprehended by the understanding, such as the rights of inheritance, servitudes, obligations, and right of intellectual property." [Emphasis added]
Corporeal movables are things, whether animate or inanimate, that normally move or can be moved from one place to another. LSA-C.C. art. 471.
Rights, obligations, and actions that apply to a movable thing are incorporeal movables. LSA-C.C. art. 473. [Emphasis added]
[3] "Copyright is an intangible, incorporeal right, in the nature of a privilege or franchise, and wholly disconnected from, and independent of, any material substance, such as the manuscript or the plate used for printing, and a sale or other transfer of such physical embodiment of the subject copyrighted does not carry with it the right to make copies, as shown infra § 26 18 C.J.S. Copyrights § 2 at p. 94.

* * * * * *
Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied....
It has been said that ownership of a copyright does not encompass ownership of the words, sounds, pictures, or images embodied in the tangible object, and that a copyright is independent of both its physical manifestation and the very thing that is copyrighted. [Emphasis added]
Transfer of ownership of any material object, including the copy of phonorecord [sic] in which the work is first fixed, does not itself convey any rights in the copyrighted work embodied in the object. 18 C.J.S. Copyrights § 26 at p. 120.
[4] Commerce Union Bank v. Tidwell, 538 S.W.2d 405 (Tenn.1976), relied upon by both South Central Bell and the majority opinion also states that such intellectual media as books and phonograph records differ from computer software in that their contents exist and can be used in only one form:

"Granted, the sound which emanates from the record when it is played is the object of the purchase; but the purchaser has no other viable method of bringing the music of, say Caruso into his living room...."
The instant case presents a different situation. A magnetic tape is only one method whereby information may be transmitted from the originator to the computer of the user.... When the information is transferred from the tape to the computer, the tape is no longer of any value to the user; and it is not retained in the possession of the user." Id. at 408.
This distinction which may have existed in Tennessee in 1976 does not exist today in Louisiana where even school children copy records onto tapes, or can listen to Caruso on compact disc or multi-media CD-ROM which can be played on their home computers and transferred by modem across phone lines. James v. Tres Computer Services, Inc., 642 S.W.2d 347 (Mo. 1982), quotes extensively from, relies upon, and adopts the same reasoning employed by the Tennessee Court in Commerce Union Bank v. Tidwell, supra, and for the same reasons should be rejected by this Court.
The fallacy of this line of reasoning is even more obvious in State v. Central Computer Services, Inc., 349 So.2d 1160 (Ala.Civ.App.), where the Alabama Supreme Court stated that:
We believe that magnetic tapes and punched cards are distinguishable from movie films. In Boswell v. Paramount Television Sales, Inc., 291 Ala. 490, 282 So.2d 892 (1973), the court noted that the right to publish or broadcast the motion picture was physically inseparable from the movie film itself. The physical presence of the movie film is essential to broadcasting the intangible artistic efforts of the actors. However, in the present case, the physical presence of magnetic tapes and punched cards is not essential to the transmittal of the desired information from its creator at University Computing Company to Central Computer Services. Testimony in the present case indicates that this information can also be telephoned to the computer or brought into Alabama in the mind of an employee of University Computing Company. (Emphasis added).
This case was written before VCR's were common, before movies were available from video stories in every neighborhood, and long before movies were available in laser disc and CD-ROM form, both of which play movies in computer readable form which can be transmitted over phone lines by modem equipped home computers.
All of the common law computer cases relied upon by the majority opinion and/or South Central Bell are based on this line of cases originating over fifteen years ago before courts anticipated that all forms of informational media would be susceptible of manifold transmutations. Many common law courts choose to continue to follow blindly what they apparently perceive as binding precedent even though we now know that the technological basis of those decisions has proven wrong.
The only other computer case relied upon by the majority opinion is the even older case of District of Colombia v. Universal Computer Assoc. Inc., 465 F.2d 615 (D.C.Cir.1972). Surely we are not reduced to reliance on a distant federal court case that is over twenty years old to determine how our civilian concepts of "corporeal" and "incorporeal" should be interpreted in light of today's technology.
[5] Citizens and So. Systems, Inc. v. South Carolina Tax Com'n, 280 S.C. 138, 311 S.E.2d 717 (1984), is based on a better perception of the capabilities and direction of technology:

Appellants rely on the reasoning in cases which hold the sale of computer software is not subject to sales or use tax because it is a sale of an intangible. Those courts distinguish software from books, records, and movies because of the separability of the computer program from the magnetic tape and the inherent inseparability of the matter contained in a book, on a record, or in a movie from the book, record or movie. See, e.g., First National Bank of Springfield v. Dept. of Revenue, 85 Ill.2d 84, 51 Ill.Dec. 667, 421 N.E.2d 175 (1981); Commerce Union Bank v. Tidewell, 538 S.W.2d 405 (Tenn.1976).
We agree with the Maryland Court of Appeals in Comptroller of the Treasury v. Equitable Trust, 296 Md. 459, 464 A.2d 248, 255 (1983), which stated, "[T]he taxability of a sale of a canned program copy should not turn on whether the buyer stores the program in memory. A tax system cannot be administered dependent upon whether or not, at the time of the transaction, the buyer's intent is to store the program continuously in memory." " We do not think the taxability of a sale of computer software depends upon the separability of the program from the tape. (Emphasis added). Id. at 718.
[6] In Chittenden Trust Co. v. King, 143 Vt. 271, 465 A.2d 1100 (1983) the Vermont statute defining tangible personal property draws a distinction between such property and "rights" analogous to our own codal distinction between "corporeals" and "incorporeals." The Vermont statute defines it as:

personal property which may be seen, weighed, measured, felt, touched or in any other manner perceived by the senses and shall include fuel and electricity, but shall not include rights and credits, insurance policies, bills of exchange, stocks and bonds and similar evidences of indebtedness or ownership. (Emphasis added). Id. at 1101.
The Chittenden court went on to state that:
"[Plaintiff] insists, however, that since the "focus of the transaction" was the transfer of intangible knowledge and information, rather that the tangible magnetic tape, a use tax should not be assessed. We disagree." (Emphasis added). Id. at 1101.
[7] Paragraph "(b)" of the Comments under LSA-C.C. art. 461 as amended by Act No. 728 of 1978 states that:

"According to French doctrine and jurisprudence, energies, including electricity, are classified as corporeal things. The purpose of this classification is to insure application of the rules dealing with theft to the unauthorized appropriation of energies.... In Louisiana, energies are clearly objects which enjoy full proprietary protection under the applicable provisions of the Criminal Code.... It is thus unnecessary to resort to a fiction and to classify energies as corporeal things." (Emphasis added).
Calling energies such as electricity corporeals is not a fiction. We know that electricity consists of subatomic particles (electrons) that have mass, weight and movement, i.e., they are part of the physical world even though they cannot be seen with the unaided eye.